THE PEOPLE OF THE STATE OF ILLINOIS, Respondent-Appellee, v. MARK GENNARDO, Petitioner-Appellant.

First District (5th Division)   No. 1—86—3023

Opinion filed May 19, 1989.

MURRAY, P.J., and COCCIA, J., specially concurring.

Law Offices of Terry Sullivan, Ltd., of Rolling Meadows (Terry Sullivan and Nancy J. Nicol, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Kenneth T. McCurry, Patricia Y. Brown, and Lauren E. Brown, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

Mark Gennardo, petitioner-appellant, filed a post-conviction petition to vacate his conviction and six years' imprisonment sentence for an unlawful delivery of cocaine and for a new trial. The petition alleged that the State failed to comply with the mandate of *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, and *Brady's* progeny to furnish to petitioner's trial counsel evidence favorable to petitioner. Petitioner further alleged that petitioner's conviction was predicated on the perjured trial testimony of the State's principal witness, Mark Bruchert, in violation of constitutional due process and the mandate of *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173, and *Napue's* progeny. After an evidentiary hearing, the post-conviction court denied the post-conviction petition and the relief therein prayed. Petitioner appeals. We reverse. Our reasons follow.

In early September 1982, Rafael Tovar, a Metropolitan Enforcement Group (MEG) undercover agent, while conducting an undercover investigation, met Mark Bruchert, a narcotics addict. On September 28, 1982, Agent Tovar purchased two ounces of cocaine from Bruchert. Immediately thereafter, Bruchert, Ray Lueders and Mark Gennardo, petitioner, were arrested. Bruchert had cocaine in his possession when he was arrested. Petitioner and Lueders were released on bond shortly after their arrest, but Bruchert did not obtain his release on bond for almost four months, until January 15, 1983.

Petitioner, age 21 years, Mark Bruchert, age 23 years, and Ray Lueders, age 20 years, were later charged in an indictment with having on September 28, 1982, in Cook County, Illinois, delivered a controlled substance (cocaine) to Rafael Tovers and Thomas Braglia. In response to petitioner's pretrial motion for discovery, the State filed its "Answer to Discovery" which, *inter alia*, stated:

"11. Evidence favorable to the defendant: None known to the People."

Thereafter, the State filed its supplemental answer to discovery, which named Mark Bruchert as an additional witness that the State intended to call as a State witness on petitioner and Lueders' trial.

The indictment came on for trial against petitioner Gennardo and codefendant Ray Lueders only. Both waived jury. On January 14, 1984, while the indictment charging him with the delivery of the cocaine to MEG undercover Agent Tovar was still pending against Bruchert, Bruchert testified as the State's principal witness at petitioner and Lueders' joint trial.

Bruchert testified that petitioner asked him to find a buyer for co-

caine; that he, Bruchert, did not know that Tovar was an undercover agent when he arranged with Tovar to sell him two ounces of cocaine; that petitioner, in Lueders' presence, gave Bruchert two ounces of cocaine, which Bruchert delivered to Tovar, while petitioner and Lueders waited outside the tavern for Bruchert to return with the $4,000 that Tovar was to pay Bruchert for the cocaine; that immediately following Bruchert's delivery of the cocaine to Agent Tovar, petitioner, Lueders and Bruchert were arrested, at which time Bruchert also had additional cocaine in his possession.

Bruchert testified on cross-examination that following his arrest he contacted MEG agents and offered to cooperate with them in making future controlled drug purchases. His offer was eventually accepted, and he worked undercover for MEG agents in narcotics investigations. In response to further cross-examination on whether he was ever paid while he was an MEG undercover informant, Bruchert's reply was that he had not been paid. Bruchert asserted that he had received only $10 on three or four occasions from the MEG agents for gasoline expenses he incurred in arranging controlled undercover narcotics purchases while acting undercover for the MEG agents. At petitioner's trial, Bruchert was specifically questioned on cross-examination about the payments he received while working undercover for MEG. Bruchert then testified:

"Q. Has anybody in connection with this case, the State's Attorneys, Agent Tovar or any other policeman that you have been dealing with in connection with this case and your work on the streets for them, have they provided you with any financial money?

A. *Other than $10.00 once in a while for gas.*

Q. Who has provided you with the $10.00 once in a while for gas?

A. Ralph Polan.

Q. All right. Is he one of the arresting officers in this case?

A. Yes he is.

Q. *How often has he provided you with $10.00 once in a while?*

A. *Maybe three or four times.*" (Emphasis added.)

On redirect examination of Bruchert, the prosecuting attorney further inquired about the payments of monies to Bruchert by the MEG agents. The prosecution asked Bruchert the following questions and Bruchert answered as follows:

"Q. Now Mr. Bruchert, you stated also on cross examination that you provided information to the Metropolitan Enforcement

Group Agents in the past; is that correct?
A. Yes.
Q. All right. Prior to the trial, were you ever given any money in exchange for that information?
A. No I wasn't.
Q. *Were you ever paid prior to your giving information?*
A. *No.*
Q. *Ever paid afterwards?*
A. *No.*" (Emphasis added.)

When the State rested, in response to defendant Lueders' motion for a finding of not guilty, the trial court stated and ruled:

"THE COURT: I don't understand the State's Attorney proceeding against this defendant, Lueders. I really am puzzled as to why you didn't nolle that case as to him. I think it is almost a travesty on justice. Motion for directed finding of not guilty is sustained. Finding of not guilty."

Thereupon, petitioner stated under oath, pursuant to questions put to him by his trial attorney, that he was the defendant in the case, that he understood that he had a right to testify in the case if he chose to, that he understood that if he wished to testify, his attorney would assist him in preparing and presenting testimony for his defense, that he and his attorney had discussed whether or not he should testify and his attorney suggested to him that he should not testify, that whether or not he wished to testify was his decision to make and that it was his decision not to testify. Petitioner presented no evidence in his defense and rested.

In urging the trial court to acquit petitioner, his trial attorney argued that the State's evidence did not prove petitioner's guilt beyond a reasonable doubt. He argued:

"You can see Mr. Bruchert was handling all the negotiations, the determination of peace [*sic*], the determining of all transfers, all phone calls, and all dealings totally with Rafael Tovar. *There is absolutely no corroboration of any criminal activity alleged to have been done by my client in this case. *** [G]iven his [Bruchert's] background, given his promise of leniency in this case, given his disrespect for the law, given all the self-serving statements, I do not believe that that is sufficient to prove my client guilty beyond a reasonable doubt.*

It would be just as likely for Mr. Bruchert to *** make it look like somebody else might have been involved in this case so that if he was caught, it would look like he was part of something greater than he actually was. The proof is consistent

with that theory just as consistent with the State's theory.

*That all leads to there being a reasonable doubt as to whether or not Mr. Gennardo is guilty of this charge. Mr. Bruchert is the only person who testifies as to any criminal activity whatsoever. It is uncorroborated, and he is an unbelievable witness. And for that reason I believe the defendant should be found not guilty."* (Emphasis added.)

The prosecutor agreed, in his final closing argument, with petitioner's attorney, that Bruchert had a criminal history and background. The trial court concluded:

"Of course, as a co-defendant and an accomplice, his [Bruchert's] testimony is viewed with great suspicion and must be corroborated. Much of it, of course, was uncorroborated, but there is significant corroboration.

First of all, *Mr. Gennardo was there.* Secondly, the police observed Bruchert going to the car where Gennardo was and coming out of there with an envelope of some sort which he took back and eventually gave to one of the officers, and it contained cocaine. *** [A]nd there is no doubt in the Court's mind that the *complicity is present.*

Therefore, as to Gennardo there will be a finding of guilty. I sustained the motion as to Lueders, the other defendant, because the record is barren of any evidence against him. I don't know why he was here." (Emphasis added.)

Realistically, the corroborative evidence, more accurately the lack thereof, of which the trial court spoke, was likewise applicable to codefendant Lueders. Codefendant Lueders was also in "the car where Gennardo was" and from which Bruchert exited, supposedly with the envelope containing the cocaine. Thereafter, Bruchert secreted himself in the public bathroom of the premises. Bruchert came out of the bathroom and delivered drugs to Agent Tovar. The complete trial record reveals that the only evidence of petitioner's involvement in Bruchert's delivery of the cocaine to Agent Tovar was Bruchert's testimony. The trial court accurately pointed out that Bruchert *did not* testimonially involve Lueders in his sale of the drugs to Agent Tovar, but that Bruchert *did* so involve petitioner. However, Bruchert's testimony was the only evidence of petitioner's involvement. As stated, the evidence on which the trial court expressly relied as corroboration of petitioner Gennardo's involvement did not corroborate petitioner's involvement any more so than it corroborated Lueders' involvement.

On February 17, 1984, Bruchert entered a plea of guilty and he

and petitioner were each sentenced to six years' imprisonment. Petitioner's judgment of conviction and sentence were affirmed by this court on March 8, 1985, in an unpublished Rule 23 order, *People v. Gennardo* (1985), 131 Ill. App. 3d 1160.

On August 15, 1985, petitioner filed the instant post-conviction petition to vacate his conviction and sentence and for a new trial. The petition alleged that Bruchert was the only witness to Bruchert's delivery of the cocaine to Agent Tovar who testimonially involved petitioner in the transaction, and that Bruchert testified as a prosecution witness against petitioner in exchange for the MEG agents' promise to recommend to the trial court on behalf of Bruchert the imposition of a minimum imprisonment sentence. Petitioner's post-conviction petition additionally alleged:

"4. Defendant [petitioner Gennardo] has recently discovered that Bruchert gave perjured testimony at trial when he denied being a paid informant.

5. Without said perjured testimony, the trial court would not have made a finding of guilty.

6. Furthermore, the State failed to disclose to the defendant that Bruchert was a paid informant, in violation of the *Brady* rule. Thus Defendant was deprived of a fair trial."

In support of petitioner's post-conviction petition, petitioner also submitted his affidavit, which stated:

"(1) On January 19, 1984, Mark Bruchert testified at my trial that he did not receive money in connection with his work on the streets for the police, except '*$10.00 once in a while for gas.*'

(2) I have recently learned that records of the Northeastern Metropolitan Narcotics and Dangerous Drugs Enforcement Group [MEG] reveal that *it paid Bruchert for 'information and services.'* " (Emphasis added.)

The State did not deny the aforestated allegations of petitioner's post-conviction petition and supporting affidavit that Bruchert lied when he testified at petitioner's trial that the only money he received from MEG and its agents while he was an informant was *$10 three or four times for gas.* Instead, the State's response was simply a "Motion to Dismiss," which merely asserted that "Petitioner's allegations fail to raise any constitutional questions within the purview of the Post-conviction Hearing Act."

Clearly, the allegations of the post-conviction petition and the supporting affidavit presented two separate and distinct, but interrelated constitutional issues for the trial court's determination, namely (1) the

consequence of the State's failure to comply with its continuing obligation to furnish the defendant favorable evidence, under the mandate of *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, and the *Brady* progeny, on petitioner's guilty finding and sentence; and (2) the consequence of perjured testimony by a State's witness on the constitutional due process validity of petitioner's conviction and sentence under *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173, and the *Napue* progeny.

The post-conviction court conducted an evidentiary hearing on the post-conviction petition. The judge who conducted the post-conviction hearing was not the trial judge. Mark Bruchert, Linda Mae, Bruchert's girl friend, Des Plaines, Illinois, police officer Christopher Terrazzi, MEG agent Rafael Tovar and Bruchert's trial attorney testified on the hearing as witnesses for the State. Petitioner's trial attorney and Bruchert's sister, Barbara Napalitano, testified on behalf of petitioner.

On the evidentiary hearing, Bruchert admitted that while he was in jail for almost four months after his arrest, unable to obtain his release on bond, he talked with MEG agents and offered to arrange a controlled undercover purchase of narcotics for the agents. Bruchert was told by the MEG agents to wait until he was released on bond. After Bruchert was released on bond, he again contacted the MEG agents and offered his services to them, as aforesaid, in exchange for their recommendation to the trial court that he receive a six-year minimum imprisonment sentence on a plea of guilty to the pending charges against him arising out of his September 28, 1982, sale of cocaine to undercover agent Tovar. Bruchert and Agent Tovar testified that Bruchert was told by the MEG agents that they would act on his behalf at his sentencing only if Bruchert arranged a controlled purchase of two or more kilograms of cocaine.

Bruchert's trial testimony was (1) that the only money that he had been given by the agents *"in connection with this case and [his] work in the streets for them,"* was *"$10.00 once in a while for gas *** maybe three or four times"* (emphasis added); (2) that he was never given any money in exchange for information; (3) that he was never paid before he gave any information; and (4) he was never paid after he gave any information. Testimony and documentary evidence admitted in the post-conviction hearing, however, established the contrary, that this trial testimony of Bruchert was false.

The post-conviction hearing evidence established that after Bruchert's release on bond on January 15, 1983, in his further attempt to effectuate his previously expressed desire to obtain a lenient sentence

on the narcotics delivery charge pending against him, on March 13, 1983, Bruchert went to the MEG office in Des Plaines and talked to MEG agents Rafael Tovar and Victoria Gadomski. This was the first time that Bruchert and Agent Tovar had seen each other since Bruchert's arrest on September 28, 1982. Bruchert agreed to become an undercover narcotics purchaser informant for the agents, and the agents agreed to recommend a minimum imprisonment sentence on his pending narcotics delivery charge, but only if Bruchert made a controlled purchase of at least two kilograms of cocaine. Pursuant to this agreement and in conformity with MEG policy and regulations, Agents Rafael Tovar and Victoria Gadomski and Mark Bruchert signed a MEG printed form agreement entitled:

> "Northeastern Metropolitan Narcotics and Dangerous Drugs Enforcement Group S.O.I. [Service of Information] advisement and Requirement document [MEG SOI Agreement]."

The MEG SOI Agreement was also signed by Bruchert, but under the fictitious name of "Tick Andrews." The agreement was signed at the MEG Des Plaines office on March 13, 1983. The agreement pertinently stated, *inter alia*:

> "I Mark Bruchert the undersigned understand that while I am a Source of Information for the Northeastern Metropolitan Narcotics and Dangerous Drugs Enforcement Group ***.
>
> *I have been advised that all payments made to me by the Northeastern Metropolitan Narcotics and Dangerous Drugs Enforcement Group are considered taxable income and should be included on state and federal tax returns."* (Emphasis added.)

The post-conviction hearing evidence further established that on the same date that Bruchert and Agents Gadomski and Tovar signed the MEG SOI Agreement, Agent Gadomski paid Bruchert (Tick Andrews) the sum of $100 for "Information and Services." The payment was witnessed by Agent Tovar. As evidence of this $100 payment to Bruchert by Agent Gadomski, Agents Gadomski and Tovar and Bruchert signed a MEG "Source of Information Receipt Funds" document (MEG SOI Receipt of Funds) in words and figures as follows:

> "Northeastern Metropolitan Narcotics
> and Dangerous Drugs Enforcement Group
> S.O.I. RECEIPT OF FUNDS
> Purpose: Purchase of Evidence [ ] Information and Services [X]
> Protection Expenses [ ]
> I hereby acknowledge the receipt of Official Advance Funds

in the amount of One Hundred and No/100 dollars ($100.00), provided to me by Special Agent /S/Victoria Gadomski

| /S/Victoria Gadomski 3/13/83 | 5/13/83 X /S/Tick Andrews |
|---|---|
| Provided by: Date (Signature and ID No.) | Date    Source of Information |

/S/J. Rafael Tovar .30
M83—0220

| Witnessed by: (Signature and ID No.) | S.O.I. No. |
|---|---|

Remarks: Re: M83—0197
   INSTRUCTIONS
1. Complete all blanks
2. Submit original to CASHIER within 48 hours of payment."

The post-conviction evidence further established that again on May 6, 1983, Agent Polar paid Bruchert $20; on May 12, 1983, Agent Rafael Tovar paid Bruchert $50; on December 19, 1983, Agent R. Polar paid Bruchert $10; on January 5, 1984, Agents John Phillips and R. Polar paid Bruchert $10; on January 17, 1984, Agent R. Polar paid Bruchert $10; and on March 20, 1984, Agent Rafael Tovar paid Bruchert $40. On the dates that the foregoing monies were paid by the agents to Bruchert, the agents and Bruchert signed seven MEG SOI Receipt of Funds. These MEG SOI Receipts of Funds were admitted into evidence as petitioner's exhibits Nos. 3A through 3G, inclusive and are included in the record on appeal before us. All of these receipts state that the purpose of the payments of the funds to Bruchert was for "Information and Services." Only the May 6, 1983, $20 receipt states, "remarks Gas for car." Only the May 12, 1983, $50 receipt states, "remarks Expenses on M83—0291." But these two receipts also state that the purpose of the payments was for "Information and Services." All the receipts were signed by Bruchert in his fictitious name of Tick Andrews. They were also signed by the agent who paid Bruchert the monies.

These receipts reflect that Bruchert was paid on a total of seven occasions an aggregate of $240 for "Information and Services," rather than *$10 three or four times for gas*, as Bruchert testified at trial. Agent Tovar admitted that the March 13, 1982, MEG SOI employment agreement and the seven receipts of payments of $240 to Bruchert were not given or disclosed to petitioner's trial attorney as

pretrial discovery material, or otherwise, before or during petitioner's trial.

Bruchert's testimony on the hearing of the post-conviction petition regarding (1) the payments of the monies to him by the agents, (2) the amounts, and (3) the purposes of the payments was a myriad of vacillating contradictions. On direct examination by the prosecutor, his answers were framed to accord with the suggestions of the leading questions that the prosecutor put to him. For example, Bruchert initially testified on direct examination on the post-conviction hearing:

"Q. During the course of the trial, the defense counsel asked you one question, whether you were paid. Do you remember that?

A. Vaguely, yes.

Q. And your answer was no, wasn't it?

A. Yes it was.

Q. But he didn't pinpoint in that trial, the lawyer, whether you were paid before the arrest, after the arrest, at the time of the arrest or any time. He just asked if you were a paid informer, right?

A. Yes.

Q. And were you telling the truth at that time?

A. Yes, I was.

Q. Were you ever a paid informer for the People of the State of Illinois in this case?

A. No, I was not."

These foregoing questions asked by the prosecutor and Bruchert's answers were in direct conflict with the seven MEG Source of Information Receipt of Funds Bruchert signed as Tick Andrews which revealed seven payments from March 13, 1983, to March 20, 1984, totaling $240 to Bruchert by the MEG agents for "Information and Services." Moreover, these foregoing post-conviction questions and answers were a grossly inaccurate and incomplete recapitulation of the questions asked of and answered by Bruchert at petitioner's trial.

After tailoring his answers to the prosecutor's risque questions at the post-conviction hearing, Bruchert was further led by the prosecutor, as follows:

"Q. So there were no other cases made for you, right?

A. Yes, there was."

It is apparent from the prosecutor's immediate subsequent response that this answer took the prosecutor by surprise. He inquired about these other cases and then asked Bruchert:

"Q. Did you get paid for any of that?

A. No, just expenses, gas, anything like that.

Q. And then when you, at the time of the trial, and they asked you if you were a paid informer, you said no, right?

A. Yes.

Q. By 'paid,' you meant whether you got $100, $500, $1,000 or a portion of the money that was recaptured. That's what you meant by being a paid informer, right?"

Although the objection of petitioner's attorney to this leading and suggestive question was sustained, the prosecutor's message by the question to Bruchert was clear, as manifested by the prosecutor's immediately following questions and Bruchert's answers thereto:

"Q. So you were never, never paid by anybody from the time you first met Bobby [Agent Rafael Tovar] until you went to the penitentiary, is that correct?

A. Yes, it is, sir.

Q. And if anything you ever got after—before you pled guilty, was gasoline or something?

A. Yes."

Bruchert finally testified on direct examination on the post-conviction hearing, in contradiction to the seven MEG SOI receipts and his trial testimony, but in absolute conformity with the prosecutor's post-conviction leading and suggestive question:

"Q. Now, at any time, from the first time you met Rafael until today, have you been paid by anybody?

A. No, I have not."

Conversely, on cross-examination, Bruchert admitted that he received the $240 referred to in the seven MEG SOI receipts, petitioner's exhibits Nos. 3A thru 3G. Bruchert also admitted that the receipts stated that the $240 was for "information and services." When petitioner's counsel commenced further cross-examination of Bruchert on each separate receipt, the following occurred:

"THE COURT: I assume his answers would be the same; that he received those funds and that they were not for information supplied.

THE WITNESS: That's correct.

[Petitioner's Attorney]: *But that each of these are marked for 'information and services.'*

THE COURT: I will accept the witness' testimony that he received those funds, is that correct, on each of those occasions, but that they were not for information.

THE WITNESS: That's correct."

Petitioner persuasively argues that Bruchert never missed a cue.

But Bruchert later inadvertently confessed on cross-examination.

> *"I asked them for some money for the time and effort that I put into it,* and that's as far as having to go there, having to put gas in the car, oil, et cetera, and they would give me some money." (Emphasis added.)

Bruchert thereafter testified on further cross-examination:

> "[Petitioner's Attorney]: I am asking if they provided him with any money, Judge.
>
> THE COURT: Other than those in the exhibits?
>
> [Petitioner's Attorney]: Any money. He has not acknowledged that money.
>
> THE COURT: It is my understanding he has. He received all the money indicated in those records.
>
> [Petitioner's Attorney]: Q. Other than $10 once in a while for gas, did you receive any other money from the State Attorney's Office.
>
> A. Never.
>
> Q. Any policemen?
>
> A. No.
>
> Q. Involved with drugs or any agents of the Metropolitan Enforcement Group?
>
> A. No."

Referring to his testimony at petitioner's trial, Bruchert finally admitted on cross-examination at the post-conviction hearing:

> "Q. Mr. Bruchert, were you asked this question and did you give this answer:
>
> > 'Q. Has anybody in connection with this case, State's Attorneys, Agent Tovar, or any other policeman that you have been dealing with in connection with this case in your work on the streets for them have they provided you with any financial money?' And did you give the answer:
> > 'Other than $10.00 once in a while for gas.'
>
> THE WITNESS: A. Yes, I believe so.
>
> \* \* \*
>
> Q. Who has provided you with the $10 once in a while for gas?
>
> A. Ralph Polar.
>
> Do you remember that question being asked and you giving that answer?
>
> THE WITNESS: A Yes.
>
> \* \* \*
>
> Q. And were you asked this question immediately after you

answered Ralph Polar?:

'Q. How often has he provided you with $10 once in a while?

A. Maybe three or four times.'

Do you recall answering that question?

THE WITNESS: A Yes."

Thus ended Bruchert's variable and fluctuating opportunistic post-conviction testimony regarding his receipt of monies from the MEG agents. Petitioner contends that this post-conviction testimony of Bruchert was nothing but a contorted series of ambivalent inconsistencies obviously calculated to extricate his contrary trial testimony from the mire of perjury.

Petitioner's trial attorney testified on petitioner's behalf at the post-conviction hearing. He related that he had never previously seen the March 13, 1983, MEG Source of Information Agreement between the MEG agents and Bruchert, or the seven MEG Source of Information receipts, and that the documents were never given to him by the State pursuant to his pretrial discovery motion. Petitioner's trial attorney further testified that he advised petitioner of his constitutional rights to be tried by a jury and to testify in his own behalf; that based upon the information he had, his investigation and his anticipation of the State's evidence, he advised petitioner to waive a jury and not testify at his trial. Petitioner's trial attorney also testified that the thrust of petitioner's trial defense was the lack of credibility of Bruchert, the State's principal witness, and that Bruchert's testimony and the other evidence did not prove petitioner's guilt beyond a reasonable doubt of a delivery of cocaine to Agent Tovar. Petitioner's trial attorney additionally stated that had he been given the March 13, 1983, MEG Agreement between the MEG agents and Bruchert and the seven MEG Receipts of Funds evidencing payment of monies to Bruchert by the MEG agents, or, had he known, or been informed of their existence or the information contained therein, he would have investigated further. He also would have altered his cross-examination of Bruchert and the agents to establish that Bruchert was a bought witness, and he would have pursued and established the flagrant contradictions between Bruchert's trial testimony, that he had only received *$10 three or four times for gas*, and his contrary post-conviction testimony and evidence that he had been paid on seven occasions an aggregate of *$240 for "Information and Services."* Petitioner's trial attorney also stated that had he possessed these documents or known of their contents, it would have changed his recommendation to petitioner that he waive a jury trial and his right to testify in his

own behalf, and that he would have conversely advised petitioner to exercise his rights to a jury trial and to testify. Petitioner's trial attorney finally related that at petitioner's trial he relied on the discovery material given him by the prosecutor and also on Bruchert's (false) trial testimony, elicited by him and the prosecutor, that the MEG agents had given Bruchert only *$10 three or four times for gas.*

Mark Bruchert's sister also testified on the post-conviction hearing. She related that her brother had used drugs, cocaine and marijuana, since he was 12 years old, that he sold drugs up until the date of his arrest on September 28, 1982, that his reputation in the community at the time of petitioner's trial was that he was a liar and that he was not to be believed. She added that she loved her brother "because he's my brother, as a person I don't like him."

Such was the evidence presented on the hearing of the post-conviction petition. After advising the parties that he had heard the arguments of counsel, reviewed the post-conviction exhibits received in evidence and the trial transcript, the post-conviction court stated:

> "The defendant's posture is twofold *** one is that the defendant, Mark Gennardo, is entitled to a new trial because of Mark Bruchert's perjury, secondly, because of the *Brady* violation involved.
>
> The *Brady* violation alleged and proven are, one, the nontender of the S.O.I. Agreement *** Defendant's Exhibit Two, and, secondly, the non-tender of the receipts for cash payments made to Mark Bruchert [defendant's] Exhibit 3A-3G."

Before setting out herein and reviewing the post-conviction court's extensive comments, findings and ruling approving the prosecutor's failure to give petitioner's trial counsel the March 13, 1983, MEG SOI Agreement between the agents and Bruchert and the seven MEG Receipt of Funds of the payments of monies to Bruchert by the agents as pretrial discovery material, "the *Brady* violation," it is appropriate and beneficial to review *Brady.* :

In *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, Brady and Boblit were charged with robbery-murder. Pursuant to Brady's attorney's pretrial request, the prosecutor showed him several, but not all, of Boblit's pretrial statements. Brady was tried first. At his jury trial Brady testified and admitted his participation in the crimes but he claimed that Boblit did the actual killing. Brady was convicted and his conviction was affirmed on appeal. Thereafter Brady learned that the prosecutor had not shown his attorney a statement by Boblit in which Boblit admitted the actual killing. Based thereon, Brady filed a post-conviction petition which was

dismissed by the trial court. The court of appeals held that the prosecutor's withholding of Boblit's statement from Brady's attorney denied Brady due process of law and remanded the case for a retrial on the question of punishment, but not on the question of guilt inasmuch as Brady had admitted at his trial his guilt on the robbery-murder. The Supreme Court granted *certiorari* and affirmed the court of appeals, holding:

> "We agree with the Court of Appeals that suppression of this [Boblit's] confession was a violation of the Due Process Clause of the Fourteenth Amendment.

> \* \* \*

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

> A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecution in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not 'the result of guile.' " 373 U.S. at 86, 87, 87-88, 10 L. Ed. 2d at 218, 218, 219, 83 S. Ct. at 1196, 1196-97, 1197.

■ It is undisputed in the case at bar that the trial prosecutor did not have the undisclosed material before or during petitioner's trial. The MEG agents did not give it to him. The trial prosecutor's good faith is not questioned, and it is not claimed that his nondisclosure was "the result of guile." There is not the slightest suggestion in the record before us that the trial prosecutor knowingly withheld the document from the defense attorney. But, as stated in *Brady*, the prosecutor's good faith, bad faith, guilt, or lack thereof are irrelevant to the nondisclosure constitutional due process issue. Moreover, *Brady* imposes a continuing duty on the prosecutor to furnish defense counsel with information favorable to the defendant and that duty is in no way altered by the prosecutor's ignorance of such information in the possession of officers involved in the investigation and prosecution of the case against the defendant.

In the case at bar, the trial court concluded and ruled on the prosecutor's nondisclosure of the MEG SOI Agreement and receipts to petitioner's trial attorney, the *Brady* violation, as follows:

> "The defense has cited further *People v. Tonkin* [(1986), 142

Ill. App. 3d 802, 492 N.E.2d 596] ***. In that case, the appellate court adopted and ~~applied~~ the harmless beyond a reasonable doubt analysis to an alleged discovery violation.

I have *** found that the S.O.I. agreement [and] Petitioner's Exhibit 3A through 3G were not tendered.

* * *

*** [T]he State and Defense were then aware [during his trial cross examination] that Mark Bruchert had, in fact, after his arrest in this case *** *become an agent for M.E.G. under the terms and conditions of Petitioner's Exhibit Two [the March 13, 1983, MEG Source of Information Agreement between the MEG agents and Bruchert.]*

While the disclosure during the course of cross examination still does not comport to the rules of the discovery in the State of Illinois, in that the documents, themselves, were never tendered, *I would note they were never requested. I would further note that the documents involved did not pertain to the conduct of Mark Bruchert in the case concerning Mark J. Gennardo* ***.

The trial was a bench trial; therefore, applying the rule as announced in People versus Tonkin—the Court must first discern whether or not there was, or would be, any material difference, or whether or not the evidence was, in fact, material, if you will.

*On the first issue, the S.O.I. Agreement, Petitioner's Exhibit Two, *** would only corroborate what Mr. Mark Bruchert had already testified to, to-wit: that he was, in fact, an agent for M.E.G.— ***. Therefore, I would find that the failure to disclose of Petitioner's Exhibit Two, the S.O.I. agreement, would simply corroborate that which Mr. Bruchert, had already testified to.*

I have the S.O.I. agreement, which would only corroborate what Mr. Bruchert said otherwise. *So I will find there was no materiality in that regard.*

I would respectfully deny the defendant's motion for a new trial." (Emphasis added.)

■ First, the post-conviction court was clearly mistaken in concluding that from petitioner's trial attorney's cross-examination of Bruchert, he became "aware that Mark Bruchert had *** become an agent for MEG *under the terms and conditions of Petitioner's Exhibit Two*" (emphasis added), the March 13, 1983, MEG agreement between the agents and Bruchert. Petitioner's trial attorney deter-

mined from his trial cross-examination of Bruchert that Bruchert had performed undercover narcotics investigations with the MEG agents, but petitioner's trial attorney certainly did not thereby learn "the terms and conditions" of the MEG SOI March 13, 1983, agreement, petitioner's exhibit No. 2. There is no evidence in the record that petitioner's trial attorney knew the terms and conditions, under the agreement, of Bruchert's employment by the MEG agents. In fact, petitioner's uncontradicted testimony on the post-conviction hearing is to the contrary. The post-conviction court's opposite conclusion is unsupported by the evidence in the record. Indeed, the conclusion contradicts the only evidence in the record and it is therefore clearly erroneous.

██ Second, because petitioner's trial attorney had not been properly furnished the March 13, 1983, MEG agreement or informed of the contents, and because he was not advised and did not know of its existence, he could not cross-examine on it. His cross-examination on the agreement was effectively and successfully defeated by the prosecutor's failure to disclose the agreement to him. In *United States v. Uramato* (9th Cir. 1980), 638 F.2d 84, 86, the court held in reversing the defendant's narcotics conspiracy conviction:

> "We have repeatedly insisted that wide latitude be given to defendants in their cross-examination of key prosecution witnesses [citations], especially when the witness is a professional informant [citations], we embraced the rule that cross-examination of a DEA informant must extend not only to his work in the immediate case, but also to his previous work with the DEA."

Petitioner's trial attorney's wide latitude cross-examination of the informant Bruchert at trial was clearly thwarted and circumvented by the prosecutor's failure to have properly complied with his *Brady* obligation.

██ Third, while the post-conviction court correctly observed that cross-examination disclosures do not comport with the discovery rules, the post-conviction court's subsequent findings, that *"the documents, themselves, were never tendered *** never requested *** and did not pertain to the conduct of Mark Bruchert in the case concerning Mark J. Gennardo [petitioner],"* were irrelevant. (Emphasis added.) *Brady* imposes a continuing duty on the prosecutor to furnish defense counsel with material favorable to the defense, whether or not requested. Moreover, petitioner's trial counsel could not have requested documents that he did not know existed. Additionally, petitioner's trial attorney was entitled to the documents even though they did not per-

tain to Bruchert's conduct in petitioner's case.

■ Fourth, the post-conviction court's conclusions that the March 13, 1983, *"S.O.I. agreement, Petitioner's Exhibit Two \*\*\* would only corroborate what Mark Bruchert had already testified to, to wit: that he was, in fact, an agent for M.E.G."* and *"there was no materiality in that regard"* are also incomplete and irrelevant conclusions. (Emphasis added.) The agreement expressly provided that Bruchert had been advised that payments made to him by MEG or its agents "are considered taxable income and should be included on state and federal tax returns." At the same time that the agreement was entered into and signed by Bruchert and the agents, the agents also paid Bruchert $100, evidenced by their signed SOI Receipt of Funds of that date, petitioner's exhibit No. 3A. Had petitioner's trial attorney been properly furnished the documents, he would have been able to have effectively cross-examined Bruchert about the payment of monies to him by the agents under the terms of the agreement, an area far beyond his mere trial testimony that he was a MEG agent. The materiality of the MEG agreement was not limited to corroborating Bruchert's trial testimony that he was a MEG agent, as the trial court erroneously concluded.

■ Fifth, regarding the materiality of the MEG agreement with Bruchert and petitioner's trial attorney's cross-examination of Bruchert thereon, had the prosecutor given the agreement to petitioner's attorney and thereby enabled him to have done so, the following language of the Supreme Court, adopted from the court of appeals, in *Brady* is indeed applicable:

> " 'We cannot put ourselves in the place of the jury and assume what their views would have been as to whether it did or did not matter whether it was Brady's hands or Boblit's hands that twisted the shirt about the victim's neck. \*\*\* [I]t would be 'too dogmatic' for us to say that the jury would not have attached any significance to this evidence \*\*\*.' " 373 U.S. at 88, 10 L. Ed. 2d at 219, 83 S. Ct. at 1197, quoting *Brady*, 226 Md. at 429-30, 174 A.2d at 171.

Likewise in the case at bar, we cannot put ourselves in the place of the learned trial judge and assume what his views would have been regarding the MEG SOI Agreement between the MEG agents and Bruchert, and petitioner's trial attorney's cross-examination of Bruchert and the MEG agents on the agreement. It too would be too dogmatic for us to say that the trial judge would not attach any significance to this evidence and cross-examination.

■ Sixth, a mere cursory comparison of Boblit's undisclosed

statement in *Brady* with the undisclosed MEG agent and Bruchert agreement in the case at bar clearly establishes that the post-conviction court's evaluation of the MEG SOI Agreement as immaterial was fallacious. Brady admitted to the jury his participation in the robbery-murder. He denied, however, that he killed the victim and stated to the jury that Boblit did the actual killing. In Boblit's withheld statement, Boblit confessed that he killed the victim. Brady was tried first. The Supreme Court did not state that, or how, Boblit's statement would have been admissible in Brady's trial, or that Brady could call Boblit as a witness and examine or cross-examine Boblit on the contents of his statement over Boblit's assertion of his constitutional privilege against self-incrimination while the robbery-murder charge was pending against him. The Supreme Court did not determine how Brady could beneficially use Boblit's statement at his trial on the issue of Brady's innocence or punishment. The Supreme Court observed in *Brady*, and quoted from the opinion of the Court of Appeals, as follows:

> " 'There is considerable doubt as to how much good Boblit's undisclosed confession would have done Brady if it had been before the jury. It clearly implicated Brady as being the one who wanted to strangle the victim Brooks. Boblit, according to this statement, also favored killing him, but he wanted to do it by shooting.' " *Brady*, 373 U.S. at 88, 10 L. Ed. 2d at 219, 83 S. Ct. at 1197, quoting *Brady*, 226 Md. at 429-30, 174 A.2d at 171.

Brooks was strangled, as Brady preferred. Nevertheless, the Supreme Court in *Brady* held that it would not usurp the fact finder's province by assuming what impact Boblit's undisclosed statement would, could, or should have had on the Brady fact finders, and concluded that the prosecutor's withholding of Boblit's undisclosed statement violated Brady's constitutional right to due process.

■ Seventh, relying on a gossamer distinction between *Tonkin* and the case at bar, the post-conviction court misinterpreted and misapplied *People v. Tonkin* (1986), 142 Ill. App. 3d 802, 492 N.E.2d 596, in assessing the prosecutor's nondisclosure of the March 13, 1983, MEG SOI Agreement between the agents and Bruchert and in denying petitioner's post-conviction relief. In *Tonkin*, the defendant's rape conviction was reversed in the post-conviction proceedings because the prosecutor did not disclose to the defendant's trial attorney the victim's forgery felony convictions. The *Tonkin* court pointed out, as in the case at bar, that "the essential elements of the State's case were contained only in the testimony of the victim. Her testimony

was not cumulative \*\*\*. \*\*\* [T]he credibility of the witness was the key element in this case \*\*\*." (142 Ill. App. 3d at 805.) The same is true in the case at bar. Unlike the post-conviction court in the case at bar, however, the *Tonkin* court concluded:

> "Instead of analyzing the [nondisclosure] issue under the 'harmless error' approach, the State suggests that we use the recently enunciated standard in *United States v. Bagley* (1985), 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375. There, the court adopted the standard of it being reasonably probable that the result of the proceeding would have been different had the information been disclosed. A reasonable probability was defined as 'a probability sufficient to undermine confidence in the outcome.' (473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3384.) We choose not to do so as our supreme court has applied the 'harmless beyond a reasonable doubt' analysis to an alleged discovery violation in *People v. Weaver* (1982), 92 Ill. 2d 545.
>
> The discovery violation in the present case was not harmless beyond a reasonable doubt. It is very conceivable that a jury, upon hearing of the victim's convictions, may have acquitted defendant." 142 Ill. App. 3d at 806.

In *People v. Weaver* (1982), 92 Ill. 2d 545, cited and relied on in *Tonkin*, the prosecutor did not disclose during pretrial discovery the defendant's post-conviction murder admissions of adultery to the mother of her husband, who the defendant was charged with murdering. Over the defendant's objection, the defendant's mother-in-law was permitted to testify to the defendant's admissions of adultery. The defendant was convicted, the appellate court reversed, and the Supreme Court affirmed the appellate court, stating:

> "The [pretrial disclosure discovery] rule encompasses not only formal statements made to the authorities but also statements made to anyone that might have bearing on the defendant's guilt or innocence. [Citation.] It is a continuing duty. The fact the State did not learn of the alleged admission until three weeks prior to trial did not negate the duty to disclose. [Citation.] Moreover, it is a violation whether or not the State's neglect was inadvertent or purposeful. [Citation.]
>
> \* \* \*
>
> \*\*\* [E]ach case must be examined in order to determine whether the State's failure was harmless, just as in any other situation in which the ultimate question is one of harmlessness. The closer the evidence, the stronger is the case for excluding

the statement or declaring a mistrial. The strength of the undisclosed evidence, the likelihood that prior notice could have helped the defense discredit the evidence \*\*\* and the wilfulness of the State in failing to disclose are also factors which must be considered. *While an indication of specific harm is helpful to a defendant in establishing that a discovery violation was prejudicial, its absence is not decisive in itself.*" (Emphasis added.) 92 Ill. 2d at 558, 560-61.

The *Bagley* case is practically identical to the case at bar. The post-conviction court, however, erroneously refused to apply *Bagley* on the expressed (mistaken) grounds that *Bagley* was "non-similar to the case in question \*\*\* there was, in a sense, a suborning of—in that the U.S. Attorney's office was aware that there was, in fact, such an agreement, and payments would, in fact, be made. This case, however, is not in that light." The post-conviction court's rejection of *Bagley* on these distinctions was specious.

In *Bagley v. Lumpkin* (9th Cir. 1983), 719 F.2d 1462, Bagley was charged with firearms and narcotics violations. Pursuant to Bagley's pretrial request for information, the government filed affidavits of its two key witnesses against Bagley, O'Connor and Mitchell, that they had neither received nor expected compensation for their undercover informant services. Bagley was tried by the court and found guilty of the narcotics violation only. Almost three years later Bagley learned that during the government's preindictment investigation of him, both witnesses had signed with the government a "contract for purchase of information and lump sum therefor" and had received payments from the government for their services. Bagley filed a post-conviction petition in which he asserted that the prosecutor's nondisclosure of this information about O'Connor and Mitchell violated his due process rights. The post-conviction hearing judge, who was the same as the trial judge, conducted an evidentiary hearing on Bagley's post-conviction petition, found beyond a reasonable doubt that disclosure of the agreements and payments would not have affected the outcome of the trial, and denied Bagley relief. The court of appeals, in reversing, applied to the prosecutor's nondisclosure of the *Brady* information the harmless-error-beyond-a-reasonable-doubt standard, and after pointing out that the government's nondisclosure inhibited Bagley's ability to effectively cross-examine the two important prosecution witnesses, the court held:

"[T]he government's failure to produce requested *Brady* information is a serious due process violation. \*\*\* [A] failure to disclose requested *Brady* information that the defendant could use

to conduct an effective cross-examination is even more egregious because it threatens the defendant's right to confront adverse witnesses, *and \*\*\* requires an automatic reversal.*" (Emphasis added.) 719 F.2d at 1464.

The Supreme Court granted *certiorari* in *United States v. Bagley* (1985), 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375, and held:

"The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

\* \* \*

\*\*\* [T]he *reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case.*

\* \* \*

Accordingly, we reverse the judgment of the Court of Appeals and remand the case to that court for a determination on whether there is a reasonable probability that, had the inducement offered by the Government to O'Connor and Mitchell been disclosed to the defense, the result of the trial would have been different." 473 U.S. at 682, 683, 684, 87 L. Ed. 2d at 494, 494, 495, 105 S. Ct. at 3383, 3384, 3385.

In the case at bar, petitioner's trial attorney's testimony at the post-conviction hearing on the adverse effect the prosecutor's nondisclosure of the MEG SOI Agreement *Brady* material had on his presentation of the defendant's case is undisputed. Petitioner's trial attorney related that had he been furnished the undisclosed material (1) he would not have advised petitioner to waive jury, but conversely; (2) he would have advised petitioner to exercise his constitutional right to be tried by a jury; (3) he could have far more effectively cross-examined Bruchert on motive, intent, a bought witness, etc., establishing bias; (4) he would not have advised petitioner not to testify in his own behalf, but conversely; and (5) he would have advised petitioner to testify in his own behalf.

On remand in *Bagley*, the Court of Appeals concluded that the case was again before it to determine if the prosecutor's nondisclosure " 'undermines confidence in the outcome of the trial,' requiring reversal of Bagley's conviction." (*Bagley v. Lumpkin* (9th Cir. 1986), 798 F.2d 1297, 1300.) The Court of Appeals held that the trial court erred when it ruled that disclosure of the withheld *Brady* material would not have affected his guilty decision. The court of appeals

stated that the inquiry was not how the trial judge would evaluate the evidence, rather, the proper inquiry was how the absence of the evidence objectively might have affected the outcome of the trial.

The court of appeals further observed in *Bagley* that " '[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within the general rule [of Brady],' " and that, "to determine whether the impeachment evidence withheld here was sufficiently material to require reversal of Bagley's conviction, we must evaluate whether 'if disclosed and used effectively, [the impeachment evidence] may make the difference between conviction and acquittal.' " (*Bagley*, 798 F.2d at 1300, quoting *United States v. Bagley*, 473 U.S. at 676-76, 87 L. Ed. 2d at 490, 105 S. Ct. at 3380-81.) The court of appeals concluded in *Bagley* that defendant's attorney's "knowledge of the ATF contracts could have given Bagley an entirely different trial strategy that might have resulted in his acquittal. [Citation.] Had the defendant known the government witnesses' testimony could be impeached by showing bias or an incentive to testify falsely, *he might not have waived his right to a jury trial.*" 798 F.2d at 1301.

Finally, the court of appeals in *Bagley* held:

> "By failing to produce the inducements made to its two witnesses, who supplied the only evidence to convict Bagley, the government unconstitutionally interfered with Bagley's right to a fair trial. Therefore, *the government's Brady error undermines confidence in the outcome of Bagley's trial and requires reversal of his conviction.*" (Emphasis added.) 798 F.2d at 1302.

The post-conviction court in the case at bar did not consider whether the prosecutor's nondisclosure of the MEG agreement was harmless beyond a reasonable doubt, under *Weaver* or *Tonkin*, or whether, under *Bagley*, there was any adverse effect that the prosecutor's nondisclosure might have had on the preparation or presentation of petitioner's case. The post-conviction court in the case at bar did not consider, under *Bagley*, whether there was a reasonable probability that the result of the proceeding would have been different had the information been disclosed—a probability sufficient to undermine confidence in the outcome. The post-conviction court in the case at bar simply concluded (erroneously) that the MEG SOI Agreement was only corroborative and therefore immaterial. Under *Brady, Weaver, Tonkin, Bagley*, and the many other *Brady* successors, the post-conviction court erred when it denied petitioner's petition to vacate his conviction and sentence and for a new trial on the ground that the prosecutor's nondisclosure of the March 13, 1983, MEG SOI Agree-

ment between the agents and Bruchert was only corroborative and immaterial. Reversal is therefore required. The post-conviction court also erred when it held that the prosecutor's nondisclosure of the seven MEG SOI Receipts was "harmless beyond a reasonable doubt" and did not undermine the confidence in the outcome of the trial. Also, for this reason, reversal is likewise required.

Significantly, the post-conviction court did not conclude that the seven MEG SOI Receipts for the payments of the $240 to Bruchert, petitioner's exhibit Nos. 3A through 3G, were immaterial, as it concluded was the MEG SOI Agreement. Nor did the post-conviction court conclude that the receipts were similarly corroborative of Bruchert's trial testimony. The post-conviction court applied different criteria to the prosecutor's nondisclosure of the receipts.

The post-conviction court cautiously circumvented making an expressed ruling on petitioner's claim that Bruchert's trial testimony, that he only received $10 on three or four occasions from the MEG agents for gas, was perjury. The post-conviction court only inferentially concluded, and thereby also only inferentially ruled, that it was not perjury. Before setting out and discussing the post-conviction court's conclusions and rulings of the agents' payments of the monies to Bruchert, Bruchert's trial and post-conviction testimony and petitioner's perjury claim, it is likewise appropriate and beneficial to also review *Napue* and *Napue*'s successors.

In *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173, the State's principal witness, who was then serving a prison sentence for the same murder for which Napue was on trial, testified in response to the prosecutor's question that he had received no promise of consideration in return for his testimony. This testimony was false because the prosecutor had in fact promised him consideration for his testimony. After his conviction, Napue discovered the falsehood, and based thereon, he filed a post-conviction petition to vacate his guilty finding and sentence. The trial court denied the petition. The supreme court reversed, holding:

> "[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment [citations]. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. [Citations.]
>
> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to ap-

ply merely because the false testimony goes only to the credibility of the witness. *** As stated by the New York Court of Appeals in *** *People v. Savvides*, 1 N.Y.2d 551, 557 ***:

'It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. *A lie is a lie, no matter what its subject,* and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth *** That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing as it did, a trial that could in any real sense be termed fair.'

\* \* \*

*** *[T]he false testimony used by the State in securing the conviction of petitioner may have had an effect on the outcome of the trial. Accordingly, the judgment below must be reversed.*" (Emphasis added.) 360 U.S. at 269-70, 272, 3 L. Ed. 2d at 1221, 1223, 79 S. Ct. at 1177, 1179.

In *People v. Martin* (1974), 56 Ill. 2d 322, on defendant's trial for an undercover controlled and surveilled narcotics sale to the informant, the informant falsely testified that he had not been paid or given money during the seven years he was an informant. The defendant was convicted. On review of the trial court's denial of the defendant's post-conviction petition, the supreme court stated:

" 'It is established beyond doubt that the prosecution's use or reliance on testimony known to be false is a practice so lacking in fundamental fairness as to deprive an accused of due process of law. [Citations.] And where, as here, the falsity lies in the testimony of a law enforcement officer giving evidence favorable to the prosecution *** it matters not that the prosecuting attorney himself does not have knowledge of the falsity, inasmuch as "the prosecution is charged with the knowledge of its agents including the police." [Citation.] Nor *** does the false testimony have to relate to a material issue to fall into the field of fundamental unfairness. *Napue,* and the decisions of this court *** [citations] as well, demonstrate that due process is likewise denied where the falsity occurs in testimony going to the credibility of a witness.' [Citation.]

'Once the condemned use of perjured testimony has been established, *Chapman* [citation] dictated that *the burden then be placed on the State to establish beyond a reasonable doubt that the perjured testimony did not contribute to the conviction.*' "

(Emphasis added.) *Martin*, 56 Ill. 2d at 325.

In *People v. Cornille* (1983), 95 Ill. 2d 497, the defendant belatedly learned that the State's arson expert witness falsified his expert credentials on the defendant's arson trial, on which the defendant relied for post-conviction relief. Holding that the false testimony violated constitutional due process, and in awarding the defendant a new trial, the supreme court further held:

> "It is antithetical to our system of justice to refuse to grant a new trial for a defendant when it is convincingly established that he was convicted on the basis of false testimony.
>
> \* \* \*
>
> \* \* \* *'[P]erjury is the mortal enemy of justice'* [citation] and it has long been recognized that the deprivation of an individual's liberty based upon false testimony is contrary to fundamental principles of fairness in a civilized society [citations]. Every major civil and common law jurisdiction has provided some means of redress for persons unjustly convicted on false testimony. \* \* \*. 'The government of a strong and free nation does not need convictions based upon such testimony.' [Citations.]
>
> \* \* \* *'[T]he truth seeking function of the trial is corrupted by* \* \* \* *perjury whether encouraged by the prosecutor or occurring without his knowledge.'* [Citations.]
>
> \* \* \*
>
> \* \* \* [T]he prosecutor should not be permitted to avoid responsibility for the false testimony of a government witness by failing to examine readily available information that would establish that the witness is lying." (Emphasis added.) 95 Ill. 2d at 507, 508-09, 511, 513.

In *People v. Cihlar* (1986), 111 Ill. 2d 212, unknown to the defendant at trial, the rape victim told her neighbor a.few days after the crime that her assailant wore a pair of panties over his head and face which concealed his face. She contrarily testified at trial and identified the defendant as her assailant. When the defendant later learned of the victim's contrary pretrial statement to her neighbor, he relied thereon in his post-conviction petition, which was dismissed by the trial court. The appellate court reversed. The supreme court affirmed the appellate court's reversal, stating:

> "If there has been perjurious testimony at trial its falsity need not have been known personally by the prosecutor in order for there to have been a knowing use and a constitutional violation." 111 Ill. 2d at 219.

In a post-conviction petition proceeding for a new trial based upon

the perjured trial testimony of a State witness, in *People v. Shannon* (1975), 28 Ill. App. 3d 873, 878, 329 N.E.2d 399, the supreme court decreed that the State's use of *"perjured testimony is a miscarriage of justice which is abhorrent to fundamental fairness and as such is intolerable. Perjury is the mortal enemy of justice, and the battle between them must be waged at every level, including the constitutional. For the administration of human justice, the Eighth is the first and the greatest Commandment."* (Emphasis added.)

In the instant case, the post-conviction court stated that petitioner's contention was that he was "entitled to a new trial because of Mark Bruchert's [trial] perjury." The post-conviction court did not expressly resolve or decide this perjury issue. It only did so by implication, when it concluded and ruled:

"That leaves the second issue, as to whether or not he was paid any monies. He did testify that he received monies on three or four occasions, some ten dollars or so; in the best light, that amounts to forty dollars. Petitioner's Exhibits Three-A through G, both inclusive, indicate clearly that the total sum received was, in fact, two hundred and forty dollars. Does this non-disclosure, would it have affected the outcome of the trial, or perhaps better said, according to *Tomkin [sic]*, was that non-compliance, or non-disclosure, beyond a reasonable doubt?

\* \* \*

Mr. Bruchert freely admitted he was an agent for M.E.G. after his arrest.

\* \* \*

Insofar as the money, the question is whether or not thirty or forty dollars received on the other ten cases that he worked on for M.E.G., whether or not that would, in this Court's judgment, be harmless beyond a reasonable doubt.

The fact that the failure of the State to disclose petitioner's Three-A through G, both inclusive—\* \* \* had Mr. Bruchert indicated that he had not received any money, I would be forthwith granting the defendant's motion for New Trial.

In this case, *there was an error as to the amount he received.* Counsel has argued that that amount is substantial, and should have been able to be considered by the trier of fact in this case \* \* \*. *There is an issue, I suppose, basically, as to whether or not this is perjury, or whether or not a discrepancy as to the amount, his inability to recall whether or not it was forty or thirty dollars, or two hundred and forty dollars.*

The primary issue was that he did, in fact, admit to receiving funds, and that those funds were for gas money as he used it for the running around on the other ten cases.

Again, the funds presented in this case, in the S.O.I. agreement, had nothing to do with Mark J. Gennardo ***. In my review, applying *People versus Tomkin [sic]* and applying the harmless beyond a reasonable doubt analysis, I would have to say that the difference between thirty and forty dollars and two hundred and forty dollars would in fact *** be harmless beyond a reasonable doubt, in my judgment.

Stated in other words, I do not believe that the non-tender of that information would undermine the confidence and outcome of the trial. *** [T]he [trial] court *** was already aware Mark Bruchert *** serve[d] as an agent for M.E.G.; that he had received monies from M.E.G. *** I would respectfully deny the defendant's motion for a new trial." (Emphasis added.)

First, as previously pointed out herein, although the post-conviction court only obliquely referred to petitioner's contention that Bruchert's trial testimony that the MEG agents only paid him $10 three or four times for gas was perjured testimony, the post-conviction court avoided expressly ruling on this perjury contention.

Second, the post-conviction court's conclusions "that the difference between thirty and forty dollars and two hundred and forty dollars would, in fact *** be harmless error beyond a reasonable doubt, in my judgment," and the post-conviction court's belief that "the non-tender of that information would [not] undermine the confidence and outcome of the trial" totally avoided and missed the perjury issue. Equally important, and for the reasons previously discussed, why the prosecutor's nondisclosure of the March 13, 1983, MEG Bruchert agreement was prejudicial to petitioner at his trial, could have affected the outcome of the trial and was not harmless error beyond a reasonable doubt and entitled petitioner to a new trial, are equally applicable to the prosecutor's nondisclosure of the MEG SOI Receipt for Funds.

Third, the fact that, and the post-conviction court's finding that "Bruchert freely admitted he was an agent for M.E.G. after his arrest," were irrelevant on the question of whether the prosecutor's nondisclosure of the agreement and the receipts of the payment of the funds to Bruchert entitled petitioner to a new trial.

Fourth, contrary to the post-conviction court's statement, the question was not "whether or not thirty or forty dollars received on the other ten cases that he worked on for M.E.G. *** would be ***

harmless beyond a reasonable doubt." The post-conviction evidence positively established that Bruchert was paid, not $30 or $40, but rather he was paid $240, and the post-conviction court so found.

Fifth, the post-conviction court's finding that "the funds presented in this case, in the SOI Agreement, had nothing to do with Mark J. Gennardo," again, was irrelevant to the *Brady* nondisclosure issue or the *Napue* perjury issue.

Sixth, contrary to the post-conviction court's opposite conclusion, "the primary issue" was not that Bruchert "admitt[ed] to receiving funds, and that those funds were for gas money he used it for the running around on the other ten cases." One issue was the impact of the prosecutor's nondisclosure of the receipt of the payments of $240 to Bruchert on the validity of petitioner's conviction. Another issue was the impact of the prosecutor's nondisclosure of the payments of the $240 to Bruchert on the validity of petitioner's conviction. Still another issue was the impact of Bruchert's trial testimony that he was paid only $10 three or four times for gas, and the contrary post-conviction evidence that he was paid $240 for "information and services" on the due process constitutional validity of petitioner's conviction. A crucial issue was the impact of Bruchert's alleged trial perjury.

Seventh, the facts and the post-conviction court's findings that "the [trial] court *** was already aware Mark Bruchert *** served as an agent for M.E.G.; [and] that he had received monies from M.E.G." were also irrelevant to the *Brady* nondisclosure and the *Napue* perjury issues.

Eighth, just as the post-conviction court misinterpreted and misapplied *Tonkin* to the March 13, 1983, MEG SOI Agreement between the agents and Bruchert, the post-conviction court also misinterpreted and misapplied *Tonkin* to the seven receipts for the monies paid Bruchert. It also held that the prosecutor's nondisclosure of the receipts was harmless error beyond a reasonable doubt. Parenthetically, we note that *Tonkin* did not involve the validity of a criminal conviction predicated on· a State's witness' perjured testimony. Parenthetically, we also note that the requested post-conviction relief was granted in *Tonkin*—the defendant's rape conviction was reversed and the defendant was granted a new trial because of the prosecutor's nondisclosure of the victim's forgery conviction.

Ninth, the post-conviction court was exceedingly kind to Bruchert's credibility. The record, however, indicates that Bruchert was not deserving of such graciousness. The post-conviction court erroneously concluded, in the total absence of any evidentiary support, in-

deed, contrary to the evidence before it, that *"there was an error as to the amount he received," "a discrepancy as to the amount, his inability to recall whether or not it was forty or thirty dollars, or two hundred and forty dollars."* (Emphasis added.) These unsupported and unwarranted conclusions are an obfuscation of the realities of the record. Previously set forth herein is the totality of Bruchert's trial and post-conviction hearing testimony on his receipt of the monies. Bruchert never remotely suggested or inferred that *"there was an error as to the amount he received,"* or that there was *"a discrepancy as to the amount,"* or that *he was unable "to recall whether or not it was forty or thirty dollars, or two hundred and forty dollars,"* as the post-conviction court mistakenly concluded. (Emphasis added.)

Bruchert's post-conviction hearing testimony was repeatedly and fluctuatingly contradictory. Contrary to the post-conviction court's inferred and implied conclusion that Bruchert did not commit perjury at petitioner's trial, we conclude, on the record before us, that Bruchert's trial testimony that he only received $10 three or four times for gas cannot be accurately characterized or described as anything other than perjury. It reeks with deliberate deception. His post-conviction testimony is equally spurious. He admitted at the post-conviction hearing, and it appears that the admission was inadvertent, that he asked the agents "for some money for the time and effort that he put into it." We cannot be unmindful of or ignore that Bruchert was paid $100 on the day he first became an informant, March 13, 1983, before he incurred any "gas expense." If the $100 payment was for future anticipated and uncalculated gas expenses, the amount would appear to be unseemingly excessive for such a commodity. To treat Bruchert's trial testimony as anything less than perjury would constitute judicial approval, acceptance and condonation of purposeful and deliberate sworn deception, which admittedly was unknown to the prosecuting trial attorney.

Upon petitioner making this show of perjury, the burden was on the State to establish beyond a reasonable doubt that the perjured testimony did not contribute to petitioner's conviction. (*People v. Bracey* (1972), 51 Ill. 2d 514, 520.) The State did not sustain this burden in the case at bar. Based on the record before us we cannot conclude beyond a reasonable doubt that Bruchert's perjured trial testimony did not contribute to petitioner's conviction.

Bruchert's testimony of petitioner's participation in his delivery of the cocaine to Agent Tovar was for practical and realistic purposes uncorroborated. Petitioner's guilt was based solely on Bruchert's testimony. Bruchert was and had been a drug addict and a drug seller

since he was 12 years old, for over eight years. The cases are legion which hold that the testimony of a narcotics addict is subject to suspicion because habitual users of narcotics become notorious liars. (*People v. Strother* (1972), 53 Ill. 2d 95; *People v. Stalions* (1986), 139 Ill. App. 3d 1033, 488 N.E.2d 297.) Bruchert's sister testified that Bruchert's reputation in the community was that he was a liar. Unlike in *Martin*, Bruchert's sale of the drugs to Agent Tovar was not a controlled sale supervised by and under the surveillance of the agents. Bruchert was not then acting as an MEG undercover agent or informant. The only evidence that the drugs Bruchert sold to Agent Tovar were obtained by Bruchert from petitioner was Bruchert's testimony. Petitioner and defendant Ray Lueders were both in the car outside the tavern when Bruchert entered the car. It was only Bruchert's testimony that he then acquired the drugs from petitioner and not Lueders or from someone else before he entered the car, or that he didn't already have the drugs in his possession when he entered the car. After leaving the car, Bruchert went into the bathroom, where he was unobserved and in which, petitioner contends, Bruchert could have previously concealed and then obtained the drugs which, upon exiting the bathroom, he delivered to Agent Tovar. On this evidence it could be reasonably concluded, beyond a reasonable doubt, that Bruchert's perjured trial testimony contributed to petitioner's conviction.

The Court of Appeals eloquently stated in *Bagley*:

> "It is inconceivable that evidence of perjury would not, as an objective matter, affect a factfinder's assessment of a witness' credibility. When the evidence shows that the government's only witnesses lied under oath, it is contrary to reason that confidence in the outcome of the case would not objectively be undermined. * * * Evidence of bias and prejudice is certainly material for impeachment, but lies under oath to conceal bias and prejudice raise the impeachment evidence to such a level that it is difficult to imagine anything of greater magnitude that would undermine confidence in the outcome of any trial." *Bagley*, 798 F.2d at 1301.

Regarding the use of perjured testimony in a judicial proceeding, the Supreme Court of the United States held in *Mesarosh v. United States* (1956), 352 U.S. 1, 14, 1 L. Ed. 2d 1, 9-10, 77 S. Ct. 1, 8:

> "Mazzei, by his [perjured] testimony, has poisoned the water in this reservoir, and the reservoir cannot be cleansed without first draining it of all impurity. * * * [T]his Court has supervisory jurisdiction over the proceedings of the federal courts. If it has any duty to perform in this regard, it is to see that the waters

of justice are not polluted. Pollution having taken place here, the condition should be remedied at the earliest opportunity.

'The untainted administration of justice is certainly one of the most cherished aspects of our institutions. Its observance is one of our proudest boasts. *** Therefore, fastidious regard for the honor of the administration of justice requires the Court to make certain that the doing of justice be made so manifest that only irrational or perverse claims of its disregard can be asserted.' [Citation.]" 352 U.S. at 14, 1 L. Ed. 2d at 9-10, 77 S. Ct. at 8.

Because of Bruchert's perjured trial testimony that the agents only paid him $10 three or four times for gas, the post-conviction court erred in denying petitioner's petition to vacate the guilty finding and sentence entered thereon and for a new trial. The fact finders in an appropriate trial setting are the proper determiners of the impact of their testimony. Accordingly, we reverse the post-conviction court's denial of petitioner's request to vacate petitioner's guilty finding and sentence, and we vacate petitioner's conviction and sentence and remand the cause for a new trial.

Reversed and remanded.

PRESIDING JUSTICE MURRAY, specially concurring:

I agree with Justice Pincham's opinion that the decision of the United States Supreme Court in *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, and the cases following it require a reversal and remandment for a new trial. I do not agree, however, with many of the justice's conclusions. I particularly disagree with the intimation that the prosecutor knowingly used perjured testimony, or even that Bruchert's testimony was necessarily perjury. At best, the evidence that was not given to Gennardo during discovery was evidence that affected his credibility to which he and his attorney were entitled under *Brady* prior to his trial and conviction for use at the trial for the purpose of cross-examination and trial strategy in arriving at the decision as to whether Gennardo would testify.

JUSTICE COCCIA, specially concurring:

I agree that this case be reversed and remanded. I do so on the ground that the suppression of the evidence favorable to the accused constituted a due process violation of constitutional dimension requiring reversal, as the evidence in question could well be material to the

question of guilt, or punishment. See *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.

Had the full extent of the involvement of the People's chief witness Bruchert as a paid informant been known and fully and timely disclosed, as well as the totality of his participation in the arrangement made with the State in exchange for having his sentence mitigated for his role in the instant crime, defense counsel could have utilized this information in developing his strategy in any manner he saw fit in attacking the credibility of the witness. For example, had the defendant known the extent to which the government witness' testimony could have been impeached, either by a showing of his bias, or incentive to testify falsely, he could have waived his right to a jury trial or have otherwise altered his defense tactics to greater advantage. To have been denied this right is inexcusable. See *Bagley v. Lumpkin* (9th Cir. 1983), 719 F.2d 1462, *rev'd United States v. Bagley* (1985), 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375, *appeal after remand Bagley v. Lumpkin* (9th Cir. 1986), 798 F.2d 1297.

I find it unnecessary, given the foregoing, to concern ourselves with whether and to what extent the People's witness may have lied. Nor is it necessary to address the several other errors assigned by the defendant in his quest for reversal herein. The *Brady* infraction, and the *Bagley* construction thereof, is sufficient unto itself to reverse.