THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
NOEL T. STALIONS, Defendant-Appellant.

Third District No. 3—84—0574

Opinion filed January 3, 1986.—Rehearing denied February 11, 1986.

Michael E. Brandt, of Peoria, for appellant.

Bruce W. Black, State's Attorney, of Pekin (John X. Breslin and Gary F.
Gnidovec, both of State's Attorneys Appellate Service Commission, of coun-
sel), for the People.

JUSTICE STOUDER delivered the opinion of the court:

Defendant appeals his conviction for the murder of Harry Dycus
after a trial by jury in the circuit court of Tazewell County.

Defendant was charged in a five-count indictment with the mur-
der of Harry Dycus. Each count of the indictment alleged a different
portion of murder as defined in the Criminal Code of 1961, sections
9—1(a)(1) and (2) (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (2)).
Count I stated that the defendant acted with the intent to kill. Count
II claimed he acted with the intent to do great bodily harm. Count III

stated that he acted knowing that his acts would cause death. Count IV alleged that he acted knowing his acts created a strong probability of death. Count V charged that his actions created a strong probability of great bodily harm.

The evidence adduced at trial showed that on January 25, 1984, the defendant, Harry Dycus, Diane Dycus (Harry's wife), and Barry Sager were at Dycus' home drinking in the kitchen. Diane Dycus testified for the State as the only eyewitness. She stated that Harry had left the house around 10 p.m. to buy some liquor. Dycus had been drinking earlier, consuming half a pint of vodka. Dycus returned with defendant and Sager. The four sat in the kitchen, drinking and talking.

Sager, who was to drive defendant home, left to warm up the car. Diane then stated that defendant called her a "dirty bitch witch." Harry became mad and asked defendant to leave. She then stated that defendant swung his left arm and that Dycus blocked the swing with his arm. The block was such that defendant was knocked upon the kitchen table, breaking it. Harry went over to defendant and picked him up. The two separated, Dycus going to the doorway, defendant going to the sink.

Diane then heard defendant say, "I'm going to kill you, Dycus." She saw a knife in defendant's hand. Dycus was standing by the door, waiting for the defendant to leave. She then stated that defendant moved toward Dycus and stabbed him. Dycus did nothing to defend himself. Dycus died as a result of the wound.

Tony Dycus, Harry's son, next testified. He stated that while he was asleep that evening, he heard a crash coming from the kitchen. He rushed in and saw Harry on the floor. Defendant and Diane were struggling over the knife. Tony attempted to resuscitate his father, but was unsuccessful. The State further proved that Harry Dycus died as a result of severe internal bleeding, caused by a knife wound.

Defendant was the first defense witness. He stated that he, Sager and Dycus had discussed many topics at the Dycus home. Defendant then stated that the next thing he remembered doing was regaining consciousness. The kitchen was a disarray. Defendant was on the floor. Dycus was standing over him, watching him. Dycus had a menacing look on his face. Dycus' eyes followed him, never leaving. Defendant felt scared. He got up and grabbed a knife that was nearby. He started to leave, using the door that Dycus was near. Dycus reached for defendant's neck, and defendant stabbed him in the side.

Defendant then testified to many specific acts of violence upon

him by Dycus. He stated that on many occasions Dycus would get angry and act violently, sometimes injuring defendant. Dycus' mood swings were even more severe when he drank. The defense then presented numerous witnesses that testified as to Dycus' reputation for violence and as to specific acts of violence by Dycus on defendant. These witnesses also stated that as Dycus drank, he became more violent.

The jury was given five murder instructions corresponding to the counts of the indictment. The jury also received an instruction on voluntary manslaughter. Guilty verdicts were returned on counts II and V of murder. Not guilty verdicts were returned on the others. Defendant was sentenced to 20 years in prison. He brings this appeal, citing three points of error.

The first issue defendant raises is that the verdicts finding him guilty of counts II and V are legally inconsistent with the not guilty verdicts on counts I and IV. As stated earlier, defendant was indicted in five counts for the murder of Harry Dycus. Counts I, II and III allege murder as defined in section 9—1(a)(1) of the Criminal Code of 1961. The remaining counts are derived from subparagraph (a)(2).

The pertinent statute reads:

"Sec. 9—1. *** (a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another;

* * *."

Ill. Rev. Stat. 1983, ch. 38, par. 9—1.

In determining whether any legal inconsistency is involved in the verdicts in this case, some brief historical comment may be helpful. The offense of murder in the common law, and before the Criminal Code of 1961, was a general intent offense. Specific intent did not have to be shown in order to convict. All that was necessary was the showing of either express or implied malice aforethought. This was sufficient to show the general malice necessary. (*People v. Heffernan* (1924), 312 Ill. 66, 143 N.E. 411.) The purport of this principle is that the specific intent to kill may, but need not, be shown to support the offense of murder. Malice also included states of mind other than the intent to kill.

The Criminal Code of 1961 was adopted and murder was defined without any reference to malice. "The statutory [definition] of murder *** represent[s] a conscious effort on the part of the draftsmen of the Criminal Code of 1961 to express the requirements of the common-law crimes in simple language. Particularly, the draftsmen sought to avoid any reference to the common-law concept of 'malice afore-thought.' " (*People v. Davis* (1966), 35 Ill. 2d 55, 60, 219 N.E.2d 468.) Now, it is sufficient to show that the accused voluntarily and wilfully committed an act the natural tendency of which is to destroy another's life. *People v. Latimer* (1966), 35 Ill. 2d 178, 220 N.E.2d 314.

Subsections (a)(1) and (a)(2) of section 9—1 present five theories which constitute the single offense of murder. (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(2).) Each of these statutory theories has its own mental state and facts, and while it may be included in the common law definition of murder, no useful purpose is served in trying to refer those findings back to the common law definition and, further, they must stand on their own and each represent a different mental state or conduct deemed sufficient to constitute the offense.

In the drafter's comments, they describe subsection (a)(2) as being less certain than subsection (a)(1) in terms of placing it somewhere between the certainty of subsection (a)(1) and manslaughter. They state that "[s]ubsection (a)(1) is intended to define the two most culpable types of conduct" while "[s]ubsection (a)(2) is intended to define the conduct which, lacking actual intent to kill or do great bodily harm or knowledge that such a result will occur, involves knowledge of the probability that the offender's acts will cause death or great bodily harm." The degree of danger of death or great bodily harm is lesser in subsection (a)(2) than that described in the preceding subsection. There is no support that subsection (a)(2) is distinguishable from subsection (a)(1) because the drafters intended to adopt different and more specific facts than the common law express and implied malice. The plain language of the statute sets forth alternatives which are not synonymous with one another. The intent to do great bodily harm which results in death does not refer to the same mental state as that of the intent to kill.

It is suggested that three cases, *People v. Muir* (1977), 67 Ill. 2d 86, 365 N.E.2d 332, *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28, and *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331, support defendant's assertion that the verdict of not guilty as charged of intent to kill is legally inconsistent with the guilty verdicts. (See also *People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888.) We find no support for this conclusion. Even though these cases are concerned

with the same subsection, they deal with attempted murder as it relates to aggravated battery so that legal inconsistency was not an issue in any of the cases. The supreme court was primarily concerned with whether there could be an offense of attempted murder based on conduct which is also appropriately defined under battery.

The defendant appears to argue that the jury verdicts found he had the intent to kill and also did not have the intent to kill. Contrary to this assertion, there is no verdict indicating the defendant had the intent to do great bodily harm which resulted in the death of the victim. The latter is, of course, murder even in the absence of an intent to kill the victim.

Two cases which the defendant has referred to which hold verdicts or judgments legally inconsistent are those on which the acquittal of one crime is held legally inconsistent with the conviction of a different offense rather than the same offense. (See *People v. Frias* (1983), 99 Ill. 2d 193, 457 N.E.2d 1233; *People v. Pearson* (1973), 16 Ill. App. 3d 543, 306 N.E.2d 539.) *Frias* defines a legally inconsistent verdict as follows:

> " 'Verdicts of guilty of crime A but not guilty of crime B, where both crimes arise out of the same set of facts, are legally inconsistent when they necessarily involve the conclusion that the same essential element or elements of each crime were found both to exist and not to exist.' " (*People v. Frias* (1983), 99 Ill. 2d 193, 198, 457 N.E.2d 1233, 1235, citing *People v. Murray* (1975), 34 Ill. App. 3d 521, 531, 340 N.E.2d 186.)

*Frias* concerned a defendant charged with two counts of murder and one count of armed violence based on the felony of murder. The defendant was found not guilty of murder and guilty of armed violence based on having committed murder while armed. This conviction was reversed because the armed-violence conviction was improper where the predicate felony, murder, was an essential element of the armed-violence charge, which was required to be proved by the State in order to sustain the conviction of armed violence. In other words, the verdicts were legally inconsistent. Such is not the same in the present case, where there is but a single offense charged, *i.e.*, murder.

While we believe the jury was probably overinstructed, we do not believe they were misinstructed. While a general verdict would have been better in this case, the use of five separate verdicts was not fatal. We conclude there is neither any legal or logical inconsistencies in the verdicts given, and the case presented is even stronger than *People v. Cole* (1982), 91 Ill. 2d 172, 435 N.E.2d 490, which likewise concluded no legal or logical inconsistencies existed.

■ We next consider whether the trial court erred in limiting cross-examination of the State's sole eyewitness concerning her habit of glue sniffing. The sole eyewitness was the victim's wife, Diane Dycus. During an offer of proof by the defendant, she admitted that as of January 25, 1984, and for about three years prior thereto she habitually used a narcotic substance. She testified she sniffed glue on a regular basis and that using it made her "high." She denied being a user at the time of the trial and denied that her using it had any effect upon her memory or health. Following this offer of proof, the trial judge ruled defendant could not cross-examine the witness on the subject of her alleged habitual practice of sniffing glue.

Defendant asserts that the question of whether a witness is a narcotics addict is an important consideration in passing upon the credibility of a witness because the testimony of a narcotics addict is subject to suspicion due to the fact that habitual users of narcotics become notorious liars. Defendant cites *People v. Lewis* (1962), 25 Ill. 2d 396, 185 N.E.2d 168, as authority for this proposition. See also *People v. Hamby* (1955), 6 Ill. 2d 559, 129 N.E.2d 747.

At trial, and again on appeal, the parties refer to glue sniffing as drug addiction. Glue (more technically, the compound in which the glue is dissolved, *i.e.*, toluol or acetone) does not fall within the definition of the term "narcotic drug" as defined in the Illinois Controlled Substances Act (Ill. Rev. Stat. 1983, ch. 56½, par. 1100 *et seq.*) or elsewhere. Rather, glue sniffing is considered the illegal use of an "intoxicating compound" in violation of the Criminal Code of 1961, which states in pertinent part:

"Sec. 1. No person shall breathe, inhale or drink any compound liquid or chemical containing toluol, hexane *** acetone *** isopropanol *** or any other substance for the purpose of inducing a condition of intoxication, stupefaction, depression, giddiness, paralysis or irrational behavior, or in any manner changing, distorting or disturbing the auditory, visual or mental processes. For the purposes of this Act, any such condition so induced shall be deemed to be an intoxicated condition." (Ill. Rev. Stat. 1983, ch. 38, par. 81—1.)

With this in mind, intoxification caused by glue sniffing is equivalent to intoxification caused by the use of alcohol, and proof of alcoholism as affecting credibility has been implicitly approved. (See *People v. Davis* (1976), 43 Ill. App. 3d 603, 357 N.E.2d 96.) We believe the defendant should have been allowed to cross-examine the witness concerning her habitual glue sniffing for the purpose of attacking her credibility. We agree with defendant that her past status as a glue

sniffer would have been proper impeachment and would only go to the weight rather than admissibility.

The testimony of the witness was crucial in determining whether the defendant was guilty of murder or manslaughter. It is not the witness' habitual glue sniffing or even that such conduct was illegal that establishes the relevance of the testimony. Rather, such conduct may have affected the witness' mental processes and hence her credibility. The defendant made a proper offer of proof which adequately establishes the relevance of the witness' glue sniffing. If allowed to pursue the matter on cross-examination, he would have presented expert testimony as to the adverse mental effects of glue sniffing. Defendant also proposed to show by other witnesses the mental deterioration of the witness occurring during the period she sniffed glue. This is not a case where the cross-examiner tried to impeach the witness by unsupported inuendo.

The State cites a number of cases for the proposition that when no evidence is presented from which it can be concluded that a witness either used drugs or was using drugs at times relevant to the case, it has been consistently held a trial judge does not abuse his discretion in refusing to permit the defendant to cross-examine such witness in regard to the witness' alleged use of narcotics. (See *People v. McCommon* (1979), 79 Ill. App. 3d 853, 399 N.E.2d 224; *People v. Ganci* (1978), 57 Ill. App. 3d 234, 372 N.E.2d 1077; *People v. Schott* (1976), 39 Ill. App. 3d 266, 350 N.E.2d 49; *People v. Brown* (1966), 76 Ill. App. 2d 362, 222 N.E.2d 227.) We do not find these cases applicable to the present case. First the *Schott* case in its entirety is factually different from this case. Second, while the court in *McCommon, Ganci* and *Brown* held that when there is no evidence of record the witness was using or was addicted to narcotics at times relevant to the case the trial court properly excluded cross-examination concerning this subject matter, it also found in each case that no offer of proof was made to show the relevance of the cross-examination. In fact, the court in *McCommon* appeared to make an offer of proof mandatory. (*People v. McCommon* (1979), 79 Ill. App. 3d 853, 866, 399 N.E.2d 224, 234.) For these reasons, we believe the trial court committed reversible error in not allowing the defendant to cross-examine Dycus concerning her glue sniffing habits as they might have affected her mental processes.

Defendant has also cited as reversible error certain communications between the trial judge and the jury. Because this case must be retried and because such alleged errors will probably not reoccur, we find it unnecessary to consider them in this opinion.

For the foregoing reasons, the judgment of the circuit court of Tazewell County is reversed and remanded with directions the defendant be granted a new trial.

Reversed and remanded.

BARRY and WOMBACHER, JJ., concur.