No. 2-08-0569    Filed: 7-16-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04--CF--420 |
| NOEL QUEVEDO, | ) ) ) | Honorable Grant S. Wegner, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BURKE delivered the opinion of the court:

Following a bench trial, defendant, Noel Quevedo, was convicted of the first-degree murder of his eight-month-old son, Alex. See 720 ILCS 5/9--1(a)(2) (West 2004). The trial court imposed a mandatory term of life imprisonment. See 730 ILCS 5/5--8--1(a)(1)(c)(ii) (West 2004). The State's theory of the case was that defendant shook Alex to death. Defendant denied shaking Alex and argued that the baby suffered a seizure caused by brain damage from neonatal meningitis.

On appeal, defendant argues that (1) we must grant a new trial because the trial court erroneously admitted inculpatory statements that the police obtained in violation of defendant's right to counsel under Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 486 S. Ct. 1602 (1966), and Edwards v. Arizona, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981); (2) we must reverse the conviction because the State failed to prove the requisite mental state; and (3) even if we affirm the finding of guilt, we must vacate the sentence and remand the cause for a new sentencing hearing

because defendant's life sentence violates the single-subject rule of the Illinois Constitution (Ill. Const. 1970, art. IV, §8). The State disputes defendant's first two arguments but confesses error on the sentencing issue. We affirm the conviction, vacate the sentence, and remand the cause for a new sentencing hearing.

FACTS

Several facts of the case are not disputed. In 2000, defendant and his wife, Cynthia, moved to Illinois from Mexico. Defendant speaks very little English and testified through an interpreter. On March 1, 2004, the date of the incident, defendant was 23 years old. He worked as a laborer for a masonry company. Defendant lived with Cynthia and their sons, Noel Jr. and Alex, in the finished basement of defendant's brother-in-law, Manuel Marron. Noel Jr. was 22 months old and Alex was 8 months old. On that evening, defendant returned home from work, and he, Cynthia, and their sons went to a cousin's home in North Aurora. They ate dinner and watched television. Defendant drank four beers, and his cousin drank two. At one point in the evening, Alex, who was in his baby seat next to defendant, began crying. Defendant tapped the seat with his foot to stop Alex from crying.

Defendant and his family returned home after 9 p.m. Defendant was tired, and he suggested that Cynthia wash the baby bottles in the kitchen, which was on the ground floor, while he changed Alex's diaper in the basement. Alex began crying when Cynthia walked upstairs to the kitchen. Defendant changed Alex's diaper, but Alex continued to cry.

The parties dispute what happened next. Defendant testified that he rocked Alex in his arms and that, all of a sudden, Alex stopped crying and could not breathe. Alex's eyes rolled back in his head. According to the State's medical experts, Alex's condition was caused by being shaken by defendant. According to Dr. Robert Shuman, the defense expert, Alex suffered a seizure resulting

from brain damage from neonatal meningitis, which had been diagnosed and treated several months earlier.

Defendant called his wife and ran upstairs with Alex under one arm. Defendant carried Alex outside for fresh air, but Cynthia told defendant to bring him inside because it was cold outside. Defendant ran back to the basement with Alex, placed him on a bed, and used a piece of toilet paper to apply alcohol to Alex's nostrils and forehead. Cynthia picked up Alex and said his heart seemed to have stopped beating.

Defendant ran to his car to take Alex to the hospital. Defendant, Cynthia, and Manuel each called 911. Alex was unconscious. Manuel tried to give Alex cardiopulmonary resuscitation (CPR), using the tips of his fingers to push the baby's chest. Alex remained unconscious, but he was making a little noise like he wanted to breathe. Nothing was stuck in Alex's throat. Paramedics and the police arrived quickly, and Alex was transported by ambulance to Mercy Hospital in Aurora. Defendant rode to the hospital with the police.

At Mercy Hospital, medical personnel told the police that Alex's condition was caused by shaking. Alex was placed on a respirator, and at 2 or 3 a.m., he was flown by helicopter to the pediatric intensive care unit at Lutheran General Hospital. At 8:15 a.m. on March 2, 2004, a test showed that very little blood was reaching Alex's brain. On the next day, the same test showed that no blood was reaching his brain. Alex was pronounced dead, and defendant and Cynthia consented to harvesting his organs.

On June 14, 2004, the State filed a four-count indictment. Count I alleged that defendant shook Alex, knowing that such acts created a strong probability of death. See 720 ILCS 5/9--1(a)(2) (West 2004). Count II alleged that defendant shook Alex with intent to do great bodily harm. See 720 ILCS 5/9--1(a)(1) (West 2004). Count III alleged that defendant shook Alex, knowing that such

acts would cause death. See 720 ILCS 5/9--1(a)(1) (West 2004). Count IV alleged that defendant shook Alex, knowing that such acts created a strong probability of great bodily harm. See 720 ILCS 5/9--1(a)(2) (West 2004). Following the evidence, the trial court found defendant guilty of count IV and not guilty of the other three counts.

## ANALYSIS

First, defendant argues that he is entitled to a new trial because the trial court erroneously admitted inculpatory statements he made to the police after invoking his right to counsel. Second, defendant asserts that we must reverse the conviction because the State failed to prove the requisite mental state. Third, defendant contends that, even if we affirm the finding of guilt, we must vacate the sentence and remand the cause for a new sentencing hearing because defendant's life sentence violates the single-subject rule of the Illinois Constitution (Ill. Const. 1970, art. IV, §8). The State concedes the sentencing error but urges us to affirm the finding of guilt.

### A. Admissibility of Statements

Before trial, defendant moved to suppress statements he made to the police while in custody. From the time the paramedics were summoned to the time of Alex's death, defendant and Cynthia were either at a hospital or with the police. The motion alleged that the police took defendant into custody and interrogated him in Spanish. Defendant alleged that he was advised in Spanish of his right to have an attorney present, but that the interrogators' use of a different dialect created a language barrier. Defendant alleged that he made an unambiguous request for an attorney, but that the interrogators continued the questioning to clarify his request. According to the motion, the continued questioning pressured defendant to continue the conversation without an attorney even though he still wanted one. Defendant sought the suppression of his comments to the police following his request for counsel.

-4-

Aurora Detectives Trujillo and Frausto conducted custodial interrogations of defendant three times. The first interview was conducted at 11:45 p.m. on March 2, 2004, which was about 24 hours after Alex was taken to Mercy Hospital. The interview lasted 1 hour and 15 minutes. Before the substantive questioning, defendant executed a written waiver of his Miranda rights. The interview was recorded on videotape, translated into English, and transcribed. The parties stipulated to the accuracy of the transcript in general, but they used brackets to indicate words for which the translation was unclear. The transcript contains parentheses and italics to indicate nonverbal actions. At the suppression hearing, the trial court reviewed the videotape and the transcript. Defendant asserts that the following portion of the transcript shows that he invoked his right to counsel:

"TRUJILLO: Wake up! (Eng.)  Wake up! (Sp.)

FRAUSTO: I am Detective Frausto.  That is Detective Trujillo.  Uh, we have a tape going right now uh we're going to do an interview in Spanish because you don't speak English well.  Correct?

[Defendant]: Yes.

* * *

FRAUSTO: You have the right to speak with an attorney and have him or her present while you are being questioned if you desire.  Do you understand that?

[Defendant]: An attorney?  No.

FRAUSTO: You have the right to speak with an attorney and have him or her present while you are being questioned if you wish.

[Defendant]: I don't know about the *** her part.  Does it have to be a female attorney?  Or--

FRAUSTO: You have the right to--have--to your attorney here present with us while I am asking you questions.

[Defendant]: I don't have an attorney.

FRAUSTO: OK. Are you telling me now at this moment, and I want to be sure that we understand each other, do you want an attorney before you speak with us--before we ask you questions? Because you have that right. Those are your rights right now.

[Defendant]: But where are [sic] I going to pay for an attorney from. I don't--we don't have enough money t--

FRAUSTO: Right now what we are doing is we are reading you the rights of the accused, uh, because I have to read you your rights before asking you questions about this case and I have to explain your rights to you before I ask you questions. And I want you to understand that these are one of your rights, that you have the right to speak to one if you desire, and have him with you.

[Defendant]: Well if you--(interrupts as Frausto says, 'and have him with you.') <u>That will be fine, but well there is no money.</u>

FRAUSTO: OK.

TRUJILLO: Look, what's happening is that these are your rights. When--

[Defendant]: Uh huh, yes, yes, I understand that if--

TRUJILLO: When someone comes here who is in custody, who is not free to go, we have to read you your rights. Right now we are going to explain to you all of your rights. Do you understand that you don't have to speak to us if you don't want to? That is one of your rights. *** The next line is that if you *** desire the services of an attorney and you

don't have funds with which to obtain your, your attorney, one will be named to represent you without, without any cost to you.

[Defendant]: Oh, I understand. All right.

TRUJILLO: (Interrupts) Do you understand?--that they are going to give you a public attorney. That's what that means, but we want to make you understand all your rights.

[Defendant]: OK.

* * *

TRUJILLO: Now read the next part. She's going to read it to you.

FRAUSTO: 'I have read these rights, I have placed my initials next to each one, indicating that I understand what my rights are.' And that is what you just did. 'I am willing to answer questions without having an attorney present. No promises have been made, nor threats, nor have they used any pressure against me in any way.' Do you understand what I just read to you?

[Defendant]: *Nodding head.*

FRAUSTO: OK. I need your initials here, too. That I just read you. Because those are your waiver of your rights. If you need to read them again, read them to yourself so you understand what you are putting your initials there.

[Defendant]: Uhhhh--huh. <u>Then we're still going to wait until the attorney arrives.</u>

TRUJILLO: Then you don't want to talk to us? You don't want to [argue about][discuss] the reason why we are here. You're asking for--

[Defendant]: (Interrupts) All right. OK--ALL RIGHT.

TRUJILLO: No, no, no. Wait. Understand what you're doing first.

[Defendant]: Yes. All right.

TRUJILLO: We want to be sure.

[Defendant]: Yes. All right.

TRUJILLO: We are going to [argue about][discuss] the reason why you're here--

[Defendant]: Yes.

TRUJILLO: --and the reason it's being investigated.

[Defendant]: All right, yes.

TRUJILLO: Are you asking for an attorney to arrive, or do you want to talk to us?

[Defendant]: Well, right now, if it's better that way, right now, because--

TRUJILLO: (Interrupts) No, no. The decision is yours, not ours. *** The only thing that we want is that, if you want to speak with us voluntarily, knowing and understanding what you just read, is that you sign this sheet. *** But are you sure and are you understanding that you are not asking for an attorney?

FRAUSTO: And you, at any time, you can use those rights. You at any time can waive to speak with us if you desire. At any time you can say that. ***

TRUJILLO: Do you understand the process? If you have any question you can ask it.

[Defendant]: The thing is that I'm completely asleep. I--

TRUJILLO: OK.

FRAUSTO: Do you want us to wait a while before asking you questions? Can I bring you a soda?

[Defendant]: And can the attorney come right now? Right this minute?

TRUJILLO: The attorney isn't coming right now. What's happening is that we are doing the investigation. If you don't want to speak us, like this first line says, you don't have

-8-

to speak with us. The state's attorney will make the decision if you're going to be charged, what kind of charges, how many charges, and the reason you would be charged. Do you understand me? Not us.

[Defendant]: (Interrupts) But up to--

TRUJILLO: (Continues) We are here to investigate the situation that you are here. You, if you don't want to speak to us, that's your decision. If you want to clarify something that we are going to ask you, then you can answer. You can sign that document. We are going to ask you questions. If you don't want to answer the question, you don't have to answer it, and say, 'You know what? That question, I don't want to answer it.' If you want to speak with us and tell her the details from the beginning to the end, then you have the right to do so, and to stop anytime you want, under your rights.

[Defendant]: But if--

TRUJILLO: But if, but if you are going to ask for an attorney, if you want to ask for an attorney, we cannot speak with you. That means we are not going to talk about your side of the story. Do you understand me?

FRAUSTO: And that conversation ends here.

[Defendant]: <u>No then let's do it like you say. I'll answer what--what you guys ask me.</u>

TRUJILLO: You want to answer the questions that we ask you--

[Defendant]: (Interrupts) Yes, all right.

TRUJILLO: --and that you decide to answer.

[Defendant]: OK. OK.

TRUJILLO: Without ask--. Without an attorney present?

[Defendant]: Yes, all right.

TRUJILLO: OK, then sign the sheet please.

[Defendant]: Anyway, may whatever God wills be done. Have you seen my lady (wife)? Is she still there?

FRAUSTO: (Makes an affirmative gesture with the head.) Okay, right now I'm going to give you a copy of this--we have already talked with your wife." (Emphases added.)

The second interview was conducted at 8:15 p.m. on March 3, 2004, which was soon after defendant and his wife completed the organ donation forms and Alex had been removed from life support. The interview lasted 1 hour and 20 minutes. At the suppression hearing, Detective Trujillo testified that he had intended to videotape the interview, but that he activated the recording equipment in the wrong interview room, so there was no recording or transcript of the interview. Detective Trujillo testified that defendant consented to the interview being recorded, but that the videotape showed only an empty room. The detective admitted that he told defendant that Cynthia might be charged, but he denied telling defendant that Cynthia would be charged with murder if defendant did not confess.

The third interview was conducted at 11:19 p.m. on March 3, 2004, which was about three hours after the second interview. The interview lasted about a half-hour. The interview was videotaped, and the parties again stipulated to the accuracy of the transcript. Detective Trujillo gave defendant his <u>Miranda</u> warnings, and defendant agreed to speak with the detectives.

The transcript refers to the previous videotaping error, and defendant stated that he understood that the third interview was meant to revisit what had been discussed in the second interview. Defendant told the detectives that Alex cried louder when his mother left the room. The following colloquy occurred:

"[Defendant]: As soon as--she left, the child began to cry more. He was crying louder--and I grabbed him with my hands and--I tried to quiet him--and I moved him--I don't know if it was too much for him.

FRAUSTO: Yes. Here we are going to use the plush teddy bear to demonstrate--

[Defendant]: Okay. I moved him, and I grabbed him like this--(he makes the expression of moving it--strongly)--I don't know if it was a lot for him--that's what happened--before that happened to him--

FRAUSTO: You indicated earlier that it was, like, at least seven times--

[Defendant]: Yes, like, seven times--

FRAUSTO: Uhh--you have your hands holding the back--

[Defendant]: Yes, like this--yes, with this one--

FRAUSTO: --and his head moved back to the front--

[Defendant]: To the front--yes.

FRAUSTO: From the seven times *** that you moved him--and then, what happened right after that?

[Defendant]: The child was with--and he turned his eyes--then I went running to tell my wife that something was happening to the child. ***

* * *

FRAUSTO: Now, going a little bit back, when you are in the room, in the bedroom with--with the child--before that--you rocked him, like this (*he does the action of shaking him*)--seven times. The child is crying, true?

[Defendant]: Yes.

FRAUSTO: He is crying, because?

-11-

[Defendant]: The mother was not there.

* * *

FRAUSTO: Uhh--she went out of the room--you try to control the child from crying--you lose your patience--

[Defendant]: Mm-hmm--

FRAUSTO: And, what is it that you are telling him when you are rocking him?

[Defendant]: I am rocking him and I am telling him, 'Calm down, my son--go to sleep, my son--come on--let's go to sleep'--that's what I am telling him (*he makes the gesture of shaking him by holding the plush teddy bear*)

FRAUSTO: And like, there was more force than that--

[Defendant]: Yes--

FRAUSTO: --a lot more force than that--

[Defendant]: Yes, and I think that was when the damage was caused to my son."

At the end of the interview, Detective Trujillo asked defendant whether Cynthia should be charged, and defendant responded that she should not. When asked if he took responsibility for Alex's death, defendant responded "[y]es, because it was my fault that the baby died. If I had known that by grabbing him, the baby was going to die I wouldn't touch him for nothing."

The trial court denied the motion to suppress, ruling that defendant never made an unambiguous request for an attorney. The court observed that defendant was given his Miranda warnings before the first interview and that defendant signed the form before each of the three interviews. The court noted that defendant described himself during the first interview to be "completely asleep" to explain why he was having difficulty understanding the Miranda warnings. However, the court noted that defendant did not appear tired on the videotape and that his responses

to questions were coherent. The court found that defendant was not handcuffed and did not appear nervous in either of the videotaped interviews, and no evidence was presented as to whether he was handcuffed or appeared nervous during the second interview. The court noted that defendant admitted that no one struck or threatened him during any of the interviews.

The court stated that defendant initially did not understand his right to have an attorney but that the detectives explained the right to counsel in different ways several times. The court noted that, once defendant understood the process and his right to counsel, he waived it and did not express any desire to speak with an attorney during any of the interviews.

Defendant argues that the trial court should have suppressed his inculpatory statements because the police badgered him into confessing despite an unambiguous invocation of his right to counsel. Defendant further argues that, after invoking his right to counsel, he did not subsequently waive his right to counsel by initiating further conversations with the detectives. The State argues that defendant did not invoke his right to counsel and that he spoke to the police voluntarily.

A defendant bears the burden of proof on a motion to suppress evidence illegally seized (725 ILCS 5/114--12(b) (West 2008)), but the State bears the burden of proof to establish the admissibility of a confession if a defendant moves to suppress it as involuntary (725 ILCS 5/114--11(d) (West 2008); People v. Slater, 228 Ill. 2d 137, 149 (2008)). Because defendant argued that his statements to the police should have been suppressed as involuntary, the State bore the burden of proof on defendant's motion to suppress.

Generally, when a defendant moves to suppress evidence allegedly obtained in violation of Miranda, our review of the trial court's ruling involves a two-part standard of review. People v. Luedemann, 222 Ill. 2d 530, 542 (2006). The reviewing court first examines whether the trial court's factual findings are against the manifest weight of the evidence. Luedemann, 222 Ill. 2d at 542.

Second, we review <u>de novo</u> the trial court's ultimate ruling as to whether suppression is warranted. <u>People v. Harris</u>, 228 Ill. 2d 222, 230 (2008).

In this case, however, the trial court reached its decision based on videotape recordings of two of the three interrogation sessions conducted in Spanish as well as the English transcripts of the two recordings. The parties stipulated to the accuracy of the two transcripts. Thus, any discrepancies between the testimony and the police videotape are resolved by the transcript of the videotape, which we have reviewed. Accordingly, the relevant facts are not in dispute on appeal; the issue before us is a question of law, and our review is <u>de novo</u>. See <u>People v. Howerton</u>, 335 Ill. App. 3d 1023, 1025 (2003).

In <u>Miranda</u>, the United States Supreme Court held that, as a safeguard for the fifth amendment privilege against self-incrimination, an individual subjected to custodial interrogation is entitled to have counsel present during the questioning. In <u>Edwards</u>, the Court clarified that, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." <u>Edwards</u>, 451 U.S. at 484, 68 L. Ed. 2d at 386, 101 S. Ct. at 1884-85. Moreover, "an accused, *** having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." <u>Edwards</u>, 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1885. Law enforcement authorities violate this rule if they approach the accused for further interrogation without making counsel available. <u>People v. Winsett</u>, 153 Ill. 2d 335, 349 (1992). Thus, "[a]ny waiver of the right to counsel given in a discussion initiated by the

police is presumed invalid, and statements obtained pursuant to such a waiver are inadmissible in the prosecution's case in chief." Winsett, 153 Ill. 2d at 350.

As the Court observed in Davis v. United States, 512 U.S. 452, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994), the applicability of the rigid prophylactic rule of Edwards requires courts to determine whether the accused " 'actually invoked his right to counsel.' " (Emphasis in original.) Davis, 512 U.S. at 458, 129 L. Ed. 2d at 371, 114 S. Ct. at 2355, quoting Smith v. Illinois, 469 U.S. 91, 95, 83 L. Ed. 2d 488, 493, 105 S. Ct. 490, 494 (1984). To be entitled to the protection of Edwards, "the suspect must unambiguously request counsel." Davis, 512 U.S. at 459, 129 L. Ed. 2d at 371, 114 S. Ct. at 2355. If "a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, [United States Supreme Court] precedents do not require the cessation of questioning." (Emphasis in original.) Davis, 512 U.S. at 459, 129 L. Ed. 2d at 371, 114 S. Ct. at 2355; see also People v. Krueger, 82 Ill. 2d 305, 311 (1980) ("We do not believe *** that every reference to an attorney, no matter how vague, indecisive or ambiguous, should constitute an invocation of the right to counsel"); People v. Schuning, No. 2--09--0194, slip op. at 13 (April 9, 2010) ("The defendant need not articulate his desire in the manner of a Harvard linguist, but he must articulate his desire in a clear enough manner that a reasonable officer in the circumstances would understand the statement to be a request for an attorney"); People v. Sommerville, 193 Ill. App. 3d 161, 169 (1990) ("simply referring to an attorney *** does not automatically constitute an invocation of the right to counsel").

"To avoid difficulties of proof and to provide guidance to officers conducting interrogations," the determination of whether an accused actually invoked the right to counsel under Edwards and Miranda "is an objective inquiry." Davis, 512 U.S. at 458-59, 129 L. Ed. 2d at 371, 114 S. Ct. at

2355. Applying this objective standard, we conclude that defendant did not unambiguously invoke his right to counsel.

The first interview began with the detectives explaining to defendant that he had a right to consult with an attorney. Defendant responded that he did not have an attorney, could not afford one, and did not understand why the detectives referred to the attorney as "him or her." The detectives clarified these points and explained that an attorney could be provided at no cost to defendant.

Defendant said that he understood his right to counsel, and then stated "[u]hhhh--huh. Then we're still going to wait until the attorney arrives." We agree with the State that, regardless of the punctuation shown in the transcript, a reasonable police officer could have interpreted this statement as a question about the availability of an attorney rather than an unambiguous request for one. In fact, defendant asked "can the attorney come right now? Right this minute?" Detective Trujillo said that an attorney was not available that night but that defendant could request counsel and end the conversation at any time. Defendant responded "[n]o, then let's do it like you say. I'll answer what--what you guys ask me." Viewing defendant's statements in context indicates that the unavailability of an attorney at the beginning of the first interview caused him to not ask for one. Defendant executed the Miranda waiver, and he does not assert that he expressed a desire to speak with an attorney during any of the subsequent questioning. We conclude that defendant did not make an unambiguous request for counsel and that the detectives were free to elicit his inculpatory statements. The trial court did not err in denying the suppression motion and, because there was no error, we need not consider whether the admission of the statements was harmless.

Contrary to defendant's assertion, this case is distinguishable from Smith v. Illinois, 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490 (1984). In Smith, the defendant was arrested and taken to an

interrogation room. The officer questioning the defendant gave him the <u>Miranda</u> warnings, informing him that " '[y]ou have a right to consult with a lawyer and to have a lawyer present with you when you're being questioned. Do you understand that?' " <u>Smith</u>, 469 U.S. at 93, 83 L. Ed. 2d at 492, 105 S. Ct. at 491. The defendant responded, " 'Uh, yeah, I'd like to do that.' " (Emphasis omitted.) <u>Smith</u>, 469 U.S. at 93, 83 L. Ed. 2d at 492, 105 S. Ct. at 491. Instead of terminating the questioning at that point, the officer finished reading the <u>Miranda</u> rights aloud, then asked the defendant, " 'Do you wish to talk to me at this time without a lawyer being present?' " <u>Smith</u>, 469 U.S. at 93, 83 L. Ed. 2d at 492, 105 S. Ct. at 491. The defendant answered, " 'Yeah and no, uh, I don't know what's what, really.' " (Emphasis omitted.) <u>Smith</u>, 469 U.S. at 93, 83 L. Ed. 2d at 492, 105 S. Ct. at 491. He subsequently agreed to answer questions without the presence of counsel. The Supreme Court held that the defendant's initial response constituted an unequivocal request for counsel and that, under the bright-line rule stated in <u>Edwards</u>, "all questioning must cease after an accused requests counsel." (Emphasis omitted.) <u>Smith</u>, 469 U.S. at 98, 83 L. Ed. 2d at 495, 105 S. Ct. at 494.

In <u>Smith</u>, the defendant invoked his right to counsel by making an unequivocal, unambiguous request, even though the request was made before the officer finished reading the <u>Miranda</u> warnings. Here, defendant did not make an unequivocal, unambiguous request for counsel at any time. The only similarity between this case and <u>Smith</u> is that each defendant interrupted the reading of the <u>Miranda</u> warnings. Defendant's equivocal questions and statements about the availability of an attorney on the night of the interview do not qualify as a request for counsel under <u>Edwards</u>.

### B. Mental State

The trial court found defendant guilty beyond a reasonable doubt of first-degree murder under section 9--1(a)(2) of the Criminal Code of 1961 (Code) (720 ILCS 5/9--1(a)(2) (West 2004)). Pursuant to section 9--1(a)(2), "[a] person who kills an individual without lawful justification commits

first degree murder if, in performing the acts which cause the death *** he <u>knows</u> that such acts create a <u>strong probability of death or great bodily harm</u> to that individual or another." (Emphases added.) 720 ILCS 5/9--1(a)(2) (West 2004).

The requisite mental state for knowing murder under section 9--1(a)(2) is knowledge " 'that such acts create a strong probability of death or great bodily harm to that individual' " (<u>People v. Smith</u>, 372 Ill. App. 3d 762, 768 (2007), quoting 720 ILCS 5/9--1(a)(2) (West 2004)). Rather than alleging a violation of section 9--1(a)(2) in a single count, the indictment parsed the mental state into two counts. Count I omitted the term "great bodily harm" and count IV omitted the term "death" from this phrase. Defendant was found guilty only of count IV, which charged him with the knowledge that his acts created a strong probability of great bodily harm, but not death.

On appeal, defendant does not assert that the State failed to prove the allegations set forth in count IV. Instead, defendant contends that count IV does not conform to section 9--1(a)(2) and that, therefore, proving the elements of count IV was insufficient to prove him guilty of first-degree murder under section 9--1(a)(2). The parties correctly agree that defendant's argument is a matter of statutory interpretation. The interpretation of a statute is a question of law that is reviewed <u>de novo</u>. <u>People v. Lucas</u>, 231 Ill. 2d 169, 174 (2008). The fundamental rule of statutory interpretation is to give effect to the intent of the legislature. <u>People v. Jones</u>, 214 Ill. 2d 187, 193 (2005). The best indication of the legislature's intent is the language of the statute, given its plain and ordinary meaning. <u>People v. Hari</u>, 218 Ill. 2d 275, 292 (2006). Where the language is clear and unambiguous, we should give the language effect without resorting to further aids of construction. <u>People v. Collins</u>, 214 Ill. 2d 206, 214 (2005). Where the language is clear, the statute may not be revised to include exceptions, limitations, or conditions that the legislature did not express. <u>People v. Goins</u>, 119 Ill. 2d 259, 265 (1988).

In this case, count I alleged murder in that defendant knew his acts created a strong probability of death, and count IV alleged murder in that defendant knew his acts created a strong probability of great bodily harm. Defendant argues that section 9--1(a)(2) may not be so parsed into two counts because the statute "joins a defendant's contemplation of 'death or great bodily harm' as a single mental state; it does not separate them." Defendant argues that, "[b]ecause the judge specifically found that the State did not prove that [defendant] knew his conduct created a strong probability of death, he was not proved guilty of first-degree murder beyond a reasonable doubt." He contends that "[k]nowing that one's conduct is strongly probable to cause 'death or great bodily harm' is different from knowing that it is strongly probable to cause great bodily harm, but not death." We agree with the State that defendant's interpretation is contrary to the plain and ordinary meaning of the statutory language and injects a condition not expressed by the legislature.

Sections 9--1(a)(1) and 9--1(a)(2) present multiple theories constituting the single offense of first-degree murder, and each theory has its own mental state. People v. Stalions, 139 Ill. App. 3d 1033, 1036 (1986). Section 9--1(a)(2) is known as "strong probability murder." People v. Villarreal, 198 Ill. 2d 209, 213 (2001). " '[S]ubsection (a)(2) is intended to define the conduct which, lacking actual intent to kill or do great bodily harm or knowledge that such a result will occur, involves knowledge of the probability that the offender's acts will cause death or great bodily harm.' " Stalions, 139 Ill. App. 3d at 1036, quoting Ill. Ann. Stat., ch. 38, par. 9--1, Committee Comments-1961, at 16-17 (Smith-Hurd 1979).

Defendant concedes that section 9--1(a)(2) connects the terms "death" and "great bodily harm" in the alternative by using the conjunction "or." By using the word "or," the legislature expressed its intent that "death" and "great bodily harm" may be considered and proved alternatively rather than in addition to one another. If we were to link "death" and "great bodily harm" as a single

mental state as defendant advocates, we would disregard the plain and ordinary meaning of the word "or" in section 9--1(a)(2) and effectively would require proof that, in performing the acts that cause the death, the accused knows that such acts create a strong probability of death <u>and</u> great bodily harm. Moreover, requiring the State to prove that "death was at least among the contemplated results," as defendant recommends, would defeat the stated purpose of the section. <u>Stalions</u>, 139 Ill. App. 3d at 1036 (purpose of section 9--1(a)(2) is to define less culpable conduct by which defendant causes death but lacks actual intent to kill or do great bodily harm or knowledge that such a result will occur, and knows only of the probability that the acts will cause either death or great bodily harm). We decline to read into section 9--1(a)(2) a condition that the legislature did not express in its plain language. Accordingly, we hold that, by proving beyond a reasonable doubt the allegations of count IV, the State proved beyond a reasonable doubt the requisite mental state of first-degree murder as defined by section 9--1(a)(2).

Our decision is supported by <u>Stalions</u>, where the Appellate Court, Third District, considered and rejected defendant's position. In <u>Stalions</u>, the defendant was charged with five counts of first-degree murder. Each count alleged a different portion of murder as defined in sections 9--1(a)(1) and 9--1(a)(2) of the Code. As now, the requisite mental state for knowing murder under section 9--1(a)(2) was knowledge "that such acts create a strong probability of death or great bodily harm" (Ill. Rev. Stat. 1983, ch. 38, par. 9--1(a)(2)), but, rather than charging the mental state in a single count, the State parsed it into two counts, and the jury received corresponding instructions.

Count IV alleged that the defendant knew his acts created a strong probability of death. Count V alleged that he knew his acts created a strong probability of great bodily harm. <u>Stalions</u>, 139 Ill. App. 3d at 1035. The defendant was acquitted on count IV and convicted on count V (<u>Stalions</u>, 139 Ill. App. 3d at 1035), which was the identical outcome as in this case: an acquittal of knowingly

creating a strong probability of death and a conviction of knowingly creating a strong probability of great bodily harm. On appeal, the defendant argued that the verdicts were inconsistent, but the appellate court disagreed. Expressing its preference for a general verdict over separate ones, the appellate court stated, "[w]hile we believe the jury was probably overinstructed, we do not believe they were misinstructed." Stalions, 139 Ill. App. 3d at 1037. The appellate court concluded that there were neither legal nor logical inconsistencies in finding that the defendant acted with the knowledge that his acts created a strong probability of great bodily harm, but not death. Stalions, 139 Ill. App. 3d at 1037.

In People v. Dunmore, 389 Ill. App. 3d 1095 (2009), we cited Stalions with approval. In Dunmore, the jury convicted the defendant of first-degree murder under section 9--1(a)(2) of the Code. While the requisite mental state of section 9--1(a)(2) is knowledge "that such acts create a strong probability of death or great bodily harm to that individual" (720 ILCS 5/9--1(a)(2) (West 2006)), the charging instrument and the jury instructions omitted the term "death" from this phrase. Defendant was charged with the knowledge that his acts created a strong probability of great bodily harm, but not death. The jury found him guilty of the charge.

On appeal, the defendant framed the issue as " 'whether the findings of fact made by the jury pursuant to the definition and issues instructions that they received from the court were sufficient to support the conviction.' " Dunmore, 389 Ill. App. 3d at 1110. We relied upon Stalions in holding that the jury's findings supported the conviction under section 9--1(a)(2). Dunmore, 389 Ill. App. 3d at 1113 (the verdicts in Dunmore and Stalions are "functional[ly] equivalent"). We admonished the trial court that, "[a]s in Stalions, the better course in this case would have been to use instructions charging defendant with the knowledge that his acts created a strong probability of death or great bodily harm, but the trial court's deviation from the pattern instructions was not reversible error.

However, using the applicable pattern instructions would have obviated the need to address the issue on appeal." Dunmore, 389 Ill. App. 3d at 1113. We similarly admonish the State for parsing the mental state of section 9--1(a)(2) in the indictment in this case. Deviating from the statute when drafting charging instruments is unnecessary and should be avoided.

### C. Sentence

The trial court sentenced defendant to natural life imprisonment pursuant to section 5--8--1(a)(1)(c)(ii) of the Unified Code of Corrections (730 ILCS 5/5--8--1(a)(1)(c)(ii) (West 2004)). This version of section 5--8--1(a)(1)(c)(ii) provided that a person convicted of first-degree murder shall be sentenced to a term of natural life imprisonment when the death penalty is not imposed and the defendant "is a person who, at the time of the commission of the murder, had attained the age of 17 or more and is found guilty of murdering an individual under 12 years of age." 730 ILCS 5/5--8--1(a)(1)(c)(ii) (West 2004). The death penalty was not imposed. Count IV alleged--and defendant concedes the State proved beyond a reasonable doubt--that he had attained the age of 17 or more and that Alex was under 12 years of age at the time of the murder.

Defendant contends that the sentence is void and must be vacated because Public Act 89--203 (Pub. Act 89--203, eff. July 21, 1995), which had made the sentence mandatory by amending the statute under which defendant was sentenced, had been declared unconstitutional by the Illinois Supreme Court in People v. Wooters, 188 Ill. 2d 500, 520 (1999). The Wooters court held that Public Act 89--203 violated the single-subject rule of the Illinois Constitution (Ill. Const. 1970, art. IV, §8). Wooters, 188 Ill. 2d at 520. A statute that violates the single-subject clause is void in its entirety. People v. Brown, 225 Ill. 2d 188, 198 (2007). As a result, all of the amendment's provisions, including the specific provision under which defendant was sentenced, are void ab initio as if they had never been passed. Brown, 225 Ill. 2d at 198-99. "The effect of enacting an

-22-

unconstitutional amendment to a statute is to leave the law in force as it was before the adoption of the amendment." People v. Gersch, 135 Ill. 2d 384, 390 (1990). The State confesses error and correctly concedes that the statutory language mandating a term of natural life imprisonment under section 5--8--1(a)(1)(c)(ii) is void and was not reenacted after Wooters.

Defendant specifies two possible remedies for the sentencing error. He asks this court either to reduce his sentence to the statutory minimum or to remand the cause for resentencing. See 134 Ill. 2d R. 615(b). Rule 615(b)(4) provides a reviewing court with the authority to "reduce the punishment imposed by the trial court." 134 Ill. 2d R. 615(b)(4). Defendant argues that we should impose a 20-year term, the statutory minimum in effect before Public Act 89--203 was enacted, because the trial judge indicated that he would have done so if section 5--8--1(a)(1)(c)(ii) as amended did not mandate a term of natural life. See 730 ILCS 5/5--8--1(a)(1)(a) (West 1994). The court commented that "I struggle with mandatory minimums and things of that sort, and I certainly find that the fact that the legislature has taken away our discretion in a case like this, which I don't think should be a life sentence, offends me to some degree, but yet I'm obligated to follow the law as it currently exists. Certainly if that was not the case and that statute did not exist, under normal circumstances this would be a minimum 20-year [sentence]." Referring to section 5--8--1(a)(1)(c)(ii), the court added, "[t]here are times that we have to follow law that we don't agree with at all, and I will tell you that I totally disagree with the fact that in this set of facts that you should receive life imprisonment, but there are no exceptions, so under the circumstances that will be the order of the court."

The State has not commented on defendant's request for a sentence reduction under Rule 615(b)(4). Rather, the State advocates remanding the cause for a new sentencing hearing at which the trial court should impose a term according to the statutory language in effect when defendant committed the offense or when his sentence was imposed, if there was a change in the law. People

-23-

v. Horrell, 235 Ill. 2d 235, 242 (2009) ("When a change in the law such as this occurs, the defendant must be given the opportunity to choose whether to be sentenced under the law that existed at the time of offense or the newly enacted law").

In People v. Jones, 168 Ill. 2d 367 (1995), the supreme court set forth guidelines for deciding whether to remand a cause for resentencing or simply reduce the sentence under Rule 615(b)(4):

"[W]e conclude a court of review has the power to reduce a defendant's sentence on appeal once it has been determined that the trial court's sentencing decision was unlawful or an abuse of discretion. Whether the appellate court should elect to choose a new sentence, rather than remand the matter for resentencing by the trial court, depends upon all of the surrounding circumstances of each particular case. For example, the parties may have no new or additional evidence to offer upon remand and the proof presented to the trial court may have been relatively straightforward and uncomplicated. In such circumstances, it may be appropriate for the appellate court to impose sentence rather than exhaust additional judicial resources, as well as the resources of counsel for the State and the defense, that would be expended by ordering a new sentencing hearing. [Citation.] We reemphasize that the power to reduce a sentence should be exercised 'cautiously and sparingly' ([People v. O'Neal, 125 Ill. 2d 291, 300 (1988)]), but note that the authority to reduce a criminal sentence remains an important and valuable tool in the appellate court's choice of remedies when reviewing sentences imposed by the circuit court." Jones, 168 Ill. 2d at 378.

Although the trial court unambiguously expressed a desire to impose the minimum term of 20 years' imprisonment, we agree with the State that a remand is necessary. The sentencing hearing was perfunctory, which reflected the parties' recognition that the mandatory sentencing provision of section 5--8--1(a)(1)(c)(ii) obviated the need to present evidence and argument on mitigation and

aggravation. A remand to the trial court affords the parties the opportunity to present new or additional evidence. The power to reduce a sentence should be exercised " 'cautiously and sparingly' " (Jones, 168 Ill. 2d at 378, quoting O'Neal, 125 Ill. 2d at 300), and we decline to do so under the circumstances of this case. Of course, the trial court is free to exercise its discretion and impose the minimum sentence on remand if such a sentence is warranted.

For the preceding reasons, the judgment of the circuit court of Kane County is affirmed in part and vacated in part, and the cause is remanded with directions.

Affirmed in part and vacated in part; cause remanded with directions.

McLAREN and HUTCHINSON, JJ., concur.